## MABEL A. GLENNA AND ANOTHER v. PATRICK F. SULLIVAN.

245 N. W. 2d 869.

August 27, 1976—No. 45890.

■■■■■■■■

*Burns & Norha, Monte M. Miller,* and *Patrick Norha,* for appellants.

*Altman, Geraghty, Mulally & Weiss* and *Terence O'Loughlin,* for respondent.

PER CURIAM.

This is a malpractice action against defendant, Patrick F. Sullivan, an attorney, for negligently recommending that his clients accept an allegedly inadequate settlement in a personal injury suit. The trial court directed a verdict in favor of defendant. We affirm.

On September 12, 1968, plaintiffs, Mabel A. and Elmer O. Glenna, were involved in a two-car collision at an intersection in St. Paul. After the accident Mrs. Glenna was taken to a hospital, treated, and released. On September 20, 1968, Mrs. Glenna consulted Dr. Clyde Warner, an orthopedic surgeon, because she was experiencing pain in her neck, back, and shoulder. Dr. Warner arranged for her to be hospitalized at St. Luke's Hospital where an X-ray was taken of her cervical spine on September 21, 1968. This X-ray revealed calcification in the ligamentum nuchae but that fact was unknown to defendant.

Approximately 1 month after the accident Mrs. Glenna retained defendant to represent her in a personal injury action against the driver of the other car. After being retained, defendant contacted Dr. Warner and arranged for Dr. Warner to forward all medical reports concerning the injuries sustained by Mrs. Glenna in the accident. The medical reports subsequently furnished to defendant by Dr. Warner did not include any reference to the September 21, 1968, X-ray which revealed calcification in the ligamentum nuchae, and Dr. Warner testified at the trial in the instant case that he could not recall whether he was even aware of this calcification.

During the 2 years following the accident Mrs. Glenna continued to experience intermittent pain in her neck, shoulder, and back, for which Dr. Warner treated her. Finally, Dr. Warner referred Mrs. Glenna to Dr. Joseph Janes at the Mayo Clinic. Dr. Janes was a specialist in the field of orthopedic surgery at the Mayo Clinic and had taught in the field of orthopedics at the Mayo Graduate School of Medicine since 1947. Neurological and orthopedic examinations of Mrs. Glenna at the Mayo Clinic revealed no abnormalities except for the calcification in the ligamentum nuchae. Based on these examinations Dr. Janes' diagnosis was that Mrs. Glenna was suffering from a cervical sprain with damage to the ligamentum nuchae. Dr. Janes recommended, and Mrs. Glenna consented to, a surgical fusion of the 4th, 5th, 6th, and 7th cervical and 1st thoracic vertebrae.

In the course of preparing for trial in the personal injury action, defendant took the deposition of Dr. Janes on February 9, 1972. In the deposition Dr. Janes testified:

"Q. [By defendant] * * * [B]ased upon your education, experience, the history and treatment of Mrs. Glenna, do you have an opinion as to the causation of this problem?

"A. If the history is correct and the patient had no other injuries to her neck, I would say that there is a causal relationship between her problem and the accident.

"Q. And this is the history that was given to you that she did not have any previous accident?

"A. That's correct."

On cross-examination, Dr. Janes testified:

"Q. Now, doctor, you have indicated to me on one of the X-rays you did find and I thought I wrote it down here somewhere, calcification in the newby (sic) ligamentum.

"A. Ligamentum nuchae.

"Q. And of what significance was that to you?

"A. The significance is that there is where the fibers of her ligament were torn and nature had laid down calcium in the

fibers. Ordinarily the ligamentum nuchae is not visualized on an X-ray but if it has been injured calcium is laid down in it at the injured point often. This is not only present on one X-ray but on several of the laterals and seen.

\* \* \* \* \*

"Q. In your opinion, doctor, relative to causation between the surgery and this injury to the accident, am I correct that you are assuming that that calcification is a result of the accident?

"A. That's correct. If it were not there before the accident and if it developed sometime six weeks after the accident, I would assume that it was due to the accident.

\* \* \* \* \*

"Q. But if it appeared in an X-ray shorter than six weeks, then we would have to more or less agree that it may have pre-dated the accident?

"A. I wouldn't like to make a categorical statement. I would say if it were present at the time the X-rays were taken when her accident occurred then it was there before the accident.

"Q. *So then that defect there that may have caused her discomfort and necessitated the surgery and the hospitalization, if it was there before the accident or the day of the accident, was something that preceded the accident then?*

"A. *That's correct.*

"Q. Am I correct then that the opinion relative to surgery being causally related to the accident as you gave it may be different?

"A. If the conditions are the same that you have mentioned, if the calcification was there at the time of her accident, it would alter my opinion.

"Q. *And if the calcification was there the day of the accident, how would it alter your opinion?*

"A. *It must be caused by a previous accident.*" (Emphasis added.)

Defendant testified that he did not suspect that there was any evidence of calcification at the time of the accident because Dr.

Janes had stated that such calcification would have been caused by a prior injury and Mrs. Glenna had told defendant that she had had no prior injuries. In addition defendant testified that he reviewed the medical reports furnished by Dr. Warner and that these reports gave no indication that calcification was present at or near the time of the accident.

On May 8, 1973, the day scheduled for trial, defendant met Mr. and Mrs. Glenna at the courthouse after discussing the case with them in the morning. At the courthouse defendant and the attorneys for the insurance company attempted to negotiate a settlement. It was during these negotiations that defendant was informed of the September 21, 1968, X-ray showing calcification already present in Mrs. Glenna's ligamentum nuchae. Upon being informed of this fact, defendant explained to Mrs. Glenna the difficulty created by the X-ray. Defendant stated that he was concerned about the X-ray because Dr. Janes had indicated in his deposition that "it takes at least six weeks [after an injury] for the calcium to form" and that this calcification was "the reason that he operated on [Mrs. Glenna]."

Defendant testified that because of the X-ray he would have "to get some doctor here to try and impeach [Dr. Janes]," and that he would then be "just tearing [his] own case apart." Defendant further testified that it was his intention that "if [he] didn't get a settlement offer that was agreeable to the Glennas" he would have Dr. Warner testify "because [he] had Dr. Warner alerted for trial if [he] needed him."

The insurance company offered settlements of $10,000 and then $15,000, both of which were rejected by the Glennas. The insurance company finally offered $21,110. Defendant communicated these offers to the Glennas, advising them that accepting the settlement was "a gamble," that they "could go to court to try for a higher figure" but that they "most likely wouldn't" do better than $21,000. Defendant also informed the Glennas that they did not have much time to think over the final offer because the judge wanted to begin selecting a jury that day and that the

insurance company would withdraw the offer if the matter went to trial. The Glennas decided to accept the settlement offer. Subsequently, however, they had second thoughts and the settlement check has never been cashed by them.

On June 19, 1973, the Glennas commenced a malpractice action against defendant alleging, in essence, that defendant's negligent preparation of the case caused them to accept an inadequate settlement.[1] At the close of plaintiffs' case the trial court directed a verdict in favor of defendant and this appeal followed.

In Christy v. Saliterman, 288 Minn. 144, 150, 179 N. W. 2d 288, 293 (1970), this court stated the necessary elements of a legal malpractice action:

"In an action against an attorney for negligence or breach of contract, the client has the burden of proving the existence of the relationship of attorney and client; the acts constituting the alleged negligence or breach of contract; that it was the proximate cause of the damage; and that but for such negligence or breach of contract the client would have been successful in the prosecution or defense of the action."

Since in the instant case the trial court directed a verdict in favor of defendant, the issue on this appeal is whether, upon reviewing the evidence in the light most favorable to plaintiffs, there is sufficient evidence on each element to sustain a verdict in plaintiffs' favor. Rule 50.01, Rules of Civil Procedure. Nelson v. Nelson, 282 Minn. 487, 166 N. W. 2d 70 (1969).

Defendant's reason for not proceeding to trial and for accepting the $21,110 settlement is that the September 21, 1968, X-ray which revealed calcification already present in Mrs. Glenna's ligamentum nuchae created a serious doubt as to whether the automobile accident caused all of Mrs. Glenna's medical difficul-

---

[1] Plaintiffs made numerous complaints about the manner in which defendant handled their case, including defendant's alleged failure to return calls from them, his alleged failure to evaluate their damages, and his alleged failure to prepare them and other witnesses to testify.

ties. He reached that conclusion because Dr. Janes had already testified through deposition that his opinion that the automobile accident caused Mrs. Glenna's medical difficulties was based on the *assumption* that there was *no calcification* in the ligamentum nuchae at or near the time of the accident. Thus, the September 21, 1968, X-ray rendered Dr. Janes' assumption factually inaccurate, thereby undermining his expert opinion that the accident caused Mrs. Glenna's medical difficulties. Consequently, if defendant had proceeded to trial the jury would have been exposed to Dr. Janes' deposition which suggested in light of the September 21, 1968, X-ray, that Mrs. Glenna's medical difficulties might not have been caused by the automobile accident. While defendant knew that he could have Dr. Warner testify that the automobile accident caused Mrs. Glenna's difficulties, this testimony would not necessarily counteract Dr. Janes' deposition. Indeed, in light of Dr. Janes' impressive medical credentials and the fact that it was Dr. Warner who had referred Mrs. Glenna to Dr. Janes, it was quite possible that the jury would have been more persuaded by Dr. Janes rather than Dr. Warner. Confronted with this prospect, defendant believed his client should accept the $21,110 settlement offer.

Plaintiffs assert that if defendant had properly prepared his case he would have discovered the September 21, 1968, X-ray earlier, would have had the opportunity to attempt to show that the presence of calcification was insignificant, and would have, therefore, recommended against accepting an inadequate settlement. In short it is plaintiffs' contention that if defendant had discovered the X-ray earlier he would have been able to prove to the jury that the calcification shown by the September 21, 1968, X-ray was insignificant. However, Dr. Janes had already stated in his deposition that if there was calcification present at or near the time of the accident it would have altered his medical opinion that the accident was the cause of Mrs. Glenna's medical difficulties. Therefore, it was incumbent upon plaintiffs in this action to show how defendant, if he had discovered the

September 21, 1968, X-ray earlier, could have neutralized Dr. Janes' damaging deposition. On this point plaintiffs introduced no evidence whatsoever. Of critical importance is the fact that plaintiffs did not even call Dr. Janes to testify as to how his opinion would have been affected had he known of the September 21, 1968, X-ray. Plaintiffs' only medical witness to testify about the calcification was Dr. Warner, who was of the opinion that the presence of calcification was "incidental" to Mrs. Glenna's medical difficulties. However, defendant at the time of the settlement was well aware of Dr. Warner's opinion that the accident caused Mrs. Glenna's medical difficulties and was prepared to have Dr. Warner testify in favor of Mrs. Glenna if the personal injury action proceeded to trial. In sum, plaintiffs failed to introduce sufficient evidence to show that defendant's decision to accept the $21,110 settlement offer was based on insufficient or inaccurate information. Thus, even assuming that defendant was negligent in not discovering the September 21, 1968, X-ray earlier, the controlling fact is that at the time defendant recommended that the settlement be accepted he was completely and accurately informed as to all the salient factors involved in that decision. The decision as to whether the $21,110 settlement offer was reasonable under the circumstances of this case called for a professional judgment on the part of defendant. In such a situation it is well established that an attorney—

"* * * is not liable for an error or mistake in judgment as long as he acts in the honest belief that his [advice is] well-founded and in the best interest of the client." 4 Hetland & Adamson, Minnesota Practice, Jury Instruction Guides (2 ed.) JIG II, 429 G-S.

See, Sjobeck v. Leach, 213 Minn. 360, 6 N. W. 2d 819 (1942). Indeed, it is not even clear that the decision to accept the $21,110 settlement was a mistake in judgment.[2] While it is possible that

---

[2] The insurance company in the personal injury action had valued plaintiffs' claim at only $22,500, and testimony in this trial revealed they were not prepared to offer anything above that figure.

a jury could have awarded plaintiffs a sum greater than $21,110, it is also possible that the jury could have rendered a verdict substantially less than $21,110, especially in light of Dr. Janes' damaging deposition. To allow a client who becomes dissatisfied with a settlement to recover against an attorney solely on the ground that a jury might have awarded them more than the settlement is unprecedented.[3]

Therefore, we affirm the trial court.

Affirmed.

TODD, JUSTICE (concurring specially).

I concur in the result. The settlement amount, in my judgment, represents the low range of jury verdict which would be sustained without additur if the case had been properly prepared and tried.

However, I cannot agree that the actions of the defendant attorney in this case constitute a judgment decision which properly should not be subject to a malpractice claim. Judgment involves a reasoned process which presumes the accumulation of all available pertinent facts to arrive at the reasoned judgment. Here, defendant did little or nothing to accumulate all of the pertinent facts necessary to make an evaluation of plaintiffs' claim. His failure to properly review with his own medical witnesses the effect of the existence of certain calcium deposits in the injured area was particularly devastating to the deposition evidence of his own medical witness. Defense counsel had ascertained the importance of this evidence and by cross-examination had virtually destroyed the causation opinion of plaintiffs' medical expert. Proper preparation would have minimized, if not precluded, the effect of such cross-examination.

---

[3] See, Meagher v. Kavli, 256 Minn. 54, 97 N. W. 2d 370 (1959). See, also, Haughey, *Lawyers' Malpractice: A Comparative Appraisal*, 48 Notre Dame Lawyer 888, 901, where the author interpreting Meagher states, "Clearly the Minnesota court had no intention of leaving to a jury the opportunity to second-guess the attorney on questions of professional judgment and trial tactics which arise every day in every lawsuit."

Defendant handled this entire matter in a careless, ineffectual way. He is fortunate that defense counsel committed to the settlement virtually the entire reserve of the insurance carrier. However, this evaluation of the claim, as indicated previously, represents the low range of jury awards. If this case would have required judicial additur if it were a jury verdict, I would have no hesitancy in reversing the judgment entered herein.

MR. JUSTICE OTIS took no part in the consideration or decision of this case.