Dennis CARLSON, Appellant,

v.

FREDRIKSON & BYRON, P.A.,
et al., Respondents.

No. CX–91–65.

Court of Appeals of Minnesota.

Sept. 3, 1991.

Review Denied Oct. 31, 1991.

Norman Roy Grutman, Thomas J. McKenna, Grutman Greene & Humphrey, New York City, and Karla R. Wahl, Minneapolis, for appellant.

John D. French and Elizabeth Taylor, Faegre & Benson, Minneapolis, for respondents.

Considered and decided by PARKER, P.J., and PETERSON and MULALLY,* JJ.

## OPINION

PETERSON, Judge.

Appellant Dennis Carlson sued respondent Fredrikson & Byron, P.A., and two of its attorneys, respondents John Erhart and Jerome Pederson, for legal malpractice and breach of fiduciary duty. The trial court granted respondents' motion for summary judgment and Carlson appeals. We affirm.

## FACTS

Carlson first hired respondents on December 5, 1985. He subsequently asked them to represent him in his disputes with Irwin Jacobs and C.O.M.B. Co. Jacobs threatened to sue Carlson to enforce an alleged oral agreement that required Carlson to sell Jacobs 500,000 shares of C.O.M.B. stock at $10 per share. Carlson sought to enforce an agreement that required C.O.M.B. to employ him as a consultant and reimburse him for certain purchases of C.O.M.B.'s equipment. Carlson, Jacobs and C.O.M.B. reached a settlement under which Carlson sold Jacobs 200,000 shares of C.O.M.B. stock at $10 per share and Carlson received all of the money he sought from C.O.M.B.

In November 1988 Carlson sued respondents, alleging in the first count that respondents committed legal malpractice by giving him incomplete and erroneous advice that caused him to reach an unfavorable settlement of his dispute with Jacobs. In the second count, Carlson charged respondents with breaching their fiduciary duties by failing to inform him that they represented Marquette Bank and Jacobs Management Corp. (JMC) because Jacobs had substantial interests in those companies.

The record in this case shows that, if Jacobs had sued Carlson to enforce the alleged agreement for sale of C.O.M.B. stock, the following evidence would have been presented:

Carlson formed C.O.M.B. Co., a catalog mail order firm, in 1968. J. Clinton Shaver joined the company in 1978, and Carlson later sold Shaver stock in the company. In 1983, Carlson and Shaver sold 50% of C.O.M.B.'s stock to Jacobs and Theodore Deikel. In preparation for making a public offering of stock, C.O.M.B. sold one of its less profitable properties, called Enchanted Lakes, to Allison–Grey Corp., which was owned by three of Jacobs' associates, Dennis Mathisen, Dan Lindsay, and Gerald Schwalbach. Carlson and Shaver agreed to help the owners of Allison–Grey if they had trouble with Enchanted Lakes.

In February 1984 C.O.M.B. made its first public stock offering, at $8 per share. Carlson and Shaver sold some of their own stock along with the newly issued shares. Following the public offering there were approximately 5.5 million shares of

* Retired judge of the district court, acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 2.

C.O.M.B. outstanding, of which Carlson owned 845,000, Jacobs and Deikel owned 800,000 each, and Shaver owned 450,000. Deikel succeeded Carlson as CEO of C.O.M.B. in March 1985.

In March 1985 Carlson met Jacobs and offered to sell Jacobs more of his shares in C.O.M.B. In May 1985 Jacobs met with Carlson and Shaver and they further discussed the proposed sale of stock. Shaver agreed to sell Jacobs 100,000 shares of C.O.M.B. at $10 per share, which was a little less than the price of the stock on the open market. According to Jacobs, Carlson agreed to sell him 500,000 shares, and give him an option to buy an additional 300,000 shares, at $10 per share. According to Carlson, he and Jacobs failed to reach any agreement at that meeting. At the same meeting, Jacobs told Carlson and Shaver he wanted them to buy Allison–Grey from Mathisen, Lindsay and Schwalbach because Enchanted Lakes was losing money. Carlson and Shaver agreed to exchange some of their C.O.M.B. stock for Allison–Grey stock, with the price of C.O.M.B. fixed at $10 per share.

Jacobs and Carlson met again in late summer or early fall, 1985. Jacobs testified at his deposition that Carlson sought to restructure the sale of C.O.M.B. stock for tax purposes. According to Jacobs, Carlson offered to sell Jacobs 300,000 shares, with options to purchase additional shares, up to the remainder of Carlson's holdings, at prices that varied depending upon when the transaction would be completed, with some options remaining open for three years after the date of the agreement. Jacobs accepted the offer. Carlson testified that Jacobs made a new offer to purchase 300,000 shares at $10 per share and Carlson refused.

Jacobs' attorney, Stephen Winnick, drafted a stock purchase agreement that reflected the purported settlement and mailed copies to Carlson with cover letters dated September 12 and September 16, 1985. Neither party signed the agreements.

Carlson hired respondent Erhart to help him complete the purchase of Allison–Grey.

Winnick represented the three owners of Allison–Grey. At the closing of the Allison–Grey purchase, Winnick spoke with Carlson about the sale of C.O.M.B. stock to Jacobs. Jacobs then sent a letter to Carlson dated December 20, 1985, in which he said:

Thank you for closing your purchase of Enchanted Lakes. * * *

I understand the "personal reasons" which temporarily prevented you from closing on the other part of the transaction involving my purchase from you of the 300,000 shares of your C.O.M.B. stock. I agreed that between the time of our agreement in May and the postponed time of closing, I will pay you interest at the rate of 10% per annum, assuming only a reasonable delay.

Carlson wrote back:

The "personal reasons" for me not selling you stock at this time are valid.

Ted [Deikel] * * * mentioned the need for me to transfer stock to you because others at C.O.M.B. Co. were waiting to buy it. * * * It was my understanding that if I were to sell you stock, it would belong to you—not others at C.O.M.B. Co.

Jacobs stated in his affidavit that he met with Carlson in late February or early March, 1986, and Carlson proposed a further modification of the sales agreement, limiting the option term to nine months after the agreement and eliminating the option price variations. Carlson testified that he did not meet with Jacobs at any time in 1986. Carlson said he met Winnick on the street and asked him to send a copy of Jacobs' last proposal for the purchase of C.O.M.B. stock, which they had discussed at the closing of the Allison–Grey purchase.

Winnick sent Carlson a copy of the stock purchase agreement, which Jacobs had signed, by letter dated March 7, 1986. The agreement substantially altered the terms of the option presented in the September stock purchase agreements. However, the agreement, like the agreements mailed in September, had an effective date of "_____,

1985" and a closing date of January 10, 1986.

The remainder of the record is directly relevant to the malpractice suit rather than the underlying potential contract action Jacobs threatened to bring. Events after March 1986 are largely undisputed.

Carlson met with Erhart on April 15, 1986, but there is no evidence that Carlson mentioned the March 7 letter to respondents either at that meeting or at any time prior to that meeting. Carlson sold nearly 200,000 shares of C.O.M.B. on the open market, at prices between $16 and $19 per share, prior to May 1986. From May 1 to May 16 Carlson sold 250,000 more shares on the open market while the price of the stock rose beyond $30 per share. He held fewer than 400,000 shares by May 16.

On May 19 Carlson met with respondent Pederson to discuss Jacobs' threat to file suit the following week if Carlson did not sign a settlement by the close of business on May 23, 1986. Carlson brought a tape recording he made of a conversation with Shaver in which Shaver agreed that Carlson reached no agreement with Jacobs in the May 1985 meeting. Erhart discussed the matter with Pederson and told Carlson that he had a "50–50 chance of success" if Jacobs filed suit. After further discussions with Pederson on May 23, Carlson signed the first settlement agreement, under which he received more than $2.7 million in exchange for 200,000 shares of C.O.M.B. and release of all his claims against C.O.M.B.

The settlement transaction closed on June 9, 1986. Carlson sold almost all of his remaining C.O.M.B. stock by early June 1986, at prices up to $50 per share. By the end of June the stock sold at $70 per share on the open market.

On June 17, 1986, Jacobs became a director of Marquette Bank. In each of the years 1984 through 1987, Fredrikson & Byron handled more than 100 separate matters as attorneys for Marquette Bank, billing the bank more than $100,000 each year. Carl Pohlad, president and director of Marquette Bank, became a director of C.O.M.B. in 1984, shortly after Jacobs purchased his first substantial block of C.O.M.B. Pederson testified that he told Carlson that Marquette Bank was a client of Fredrikson & Byron, but Carlson stated in his affidavit that he was never informed of the representation.

On June 19, 1986, Dennis Mathisen of JMC contacted John Stout of Fredrikson & Byron concerning an entertainment law matter. Stout worked on the matter for less than a week and billed JMC less than $2,000. Jacobs is one of the principal owners of JMC. Respondents continued to represent Carlson in connection with the dispute with C.O.M.B. until December 1986.

## ISSUES

I. Does a genuine issue of material fact exist as to whether alleged negligence of counsel was a proximate cause of appellant's losses?

II. Does a genuine issue of material fact exist as to whether counsel breached a fiduciary duty owed to appellant?

## ANALYSIS

On an appeal from summary judgment, this court must determine (1) whether genuine issues of material fact exist for trial and (2) whether the trial court erred in applying the law. *Offerdahl v. University of Minn. Hosps. & Clinics*, 426 N.W.2d 425, 427 (Minn.1988). On appeal the evidence is viewed in the light most favorable to the party against whom summary judgment was granted. *Grondahl v. Bulluck*, 318 N.W.2d 240, 242 (Minn.1982). Doubts and factual inferences are to be resolved in favor of the nonmoving party. *Nord v. Herreid*, 305 N.W.2d 337, 339 (Minn.1981).

It is the rule in Minnesota that summary judgment is proper when the nonmoving party fails to provide the court with specific facts indicating that there is a genuine issue of fact. In order to successfully oppose a motion for summary judgment, a party cannot rely upon mere general statements of fact but rather must demonstrate at the time the motion is made that specific facts are in exist-

ence which create a genuine issue for trial.

*Erickson v. General United Life Ins. Co.*, 256 N.W.2d 255, 258–59 (Minn.1977) (footnote omitted).

Summary judgment must be entered, after adequate time for discovery and upon motion, against the party who fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Carlisle v. City of Minneapolis*, 437 N.W.2d 712, 715 (Minn.App.1989) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)).

## I.

To establish a cause of action for legal malpractice, Carlson must prove that respondents' alleged errors proximately caused his damages. *Fiedler v. Adams*, 466 N.W.2d 39, 42 (Minn.App.1991), *pet. for rev. denied* (Minn. Apr. 29, 1991). Therefore, to withstand a motion for summary judgment, Carlson must present evidence that could support a finding that, but for respondents' alleged negligence, he would have achieved a better result in his dispute with Jacobs. *See Carey & Emmings, Ltd. v. Ludowese*, 434 N.W.2d 483, 484–85 (Minn.App.1989). Carlson contends that he would have achieved a better result either by reaching a better settlement or by defeating at trial Jacobs' claim on the alleged agreement to sell C.O.M.B. shares. It is not sufficient for Carlson to show that, had Jacobs' claim gone to trial, Carlson might have won; there must be evidence in the record of this case from which a jury could conclude that the issues of fact in Jacobs' lawsuit would, more likely than not, have been resolved in favor of Carlson. *See Raske v. Gavin*, 438 N.W.2d 704, 706 (Minn.App.1989), *pet. for rev. denied*

(Minn. June 21, 1989). There is no evidence in the record of this case that would permit a jury to conclude that Carlson would have won at trial or would have obtained a better settlement if the dispute with Jacobs had not been settled as it was.

Carlson contends first that he would have won a lawsuit on the alleged agreement for sale of C.O.M.B. stock because he had a valid statute of frauds defense based on the lack of any contract signed by Carlson.

[T]he client must prove that the omitted defense was legally meritorious, factually provable and would have produced a better result. * * * ¶ * * * If such a defense would not have been legally sufficient and provable, there is no causal relationship between the alleged omission and the unfavorable result.

R. Mallen & J. Smith, *Legal Malpractice* § 24.18, at 494 (3d ed. 1989).

Respondents argue that the defense would have failed because the letter of March 7, 1986 meets the requirements of the statute of frauds, or because the letters of September 16, 1985, December 20, 1985, and Carlson's response, when considered together, meet the requirements of the statute. Respondents also contend that the case is removed from the statute of frauds by Jacobs' payment of interest, as indicated in his letter dated December 20, 1985, which is partial performance of the agreement.

The Minnesota statute of frauds for securities transactions provides:

A contract for the sale of securities is not enforceable by way of action or defense unless:

(a) there is some writing signed by the party against whom enforcement is sought * * * sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price; [or]

\*    \*    \*    \*    \*    \*

(c) within a reasonable time a writing in confirmation of the sale or purchase and sufficient against the sender under paragraph (a) has been received by the

party against whom enforcement is sought and the recipient has failed to send written objection to its contents within ten days after its receipt.

Minn.Stat. § 336.8–319 (1986).

Jacobs signed the stock purchase agreement enclosed with the March 7, 1986 letter, and the agreement specifies sale of 300,000 shares of C.O.M.B. at $10 per share; the cover letter indicates that the enclosed document is the stock purchase agreement whereby Carlson sells 300,000 shares of C.O.M.B. to Jacobs. Therefore, the agreement would be enforceable against Jacobs under paragraph (a). Carlson admitted that he received the March 7 letter and he failed to object within ten days after receipt. Thus, the written agreement is sufficient to meet the requirements of paragraph (c) if it was sent "within a reasonable time" after an oral agreement was reached.

Carlson denied that the letter arrived within a reasonable time after any discussion he had with Jacobs. He swore that he had no discussions with Jacobs in 1986; he received the written agreement after he met Winnick and asked to see a copy of the proposal Jacobs made in December 1985. Jacobs stated in his affidavit that he met with Carlson approximately one week before Winnick sent the letter, and in the meeting he accepted Carlson's proposal for a modification of the agreement. If Jacobs' testimony were accepted, the claim would survive a statute of frauds defense; if Carlson's testimony were accepted, the March 7 letter would be insufficient to avoid the statute of frauds.

Therefore, Carlson has presented evidence that, if Jacobs sued him, an issue of fact would determine whether the March 7 letter met the requirements of the statute of frauds. However, this showing, without more, is not sufficient for Carlson to withstand a motion for summary judgment on his claim for legal malpractice. Carlson must also present evidence to show that, more likely than not, the issue of fact would have been decided in his favor. *See Raske v. Gavin*, 438 N.W.2d 704, 706 (Minn.App.1989), *pet. for rev. denied* (Minn.1989).

Carlson argues that Jacobs' testimony is not credible, and therefore Carlson would have prevailed on the statute of frauds defense. Carlson further asserts that, even if the statute of frauds defense failed, he would have defeated Jacobs' claims at trial because Jacobs was unreliable as a witness. In his affidavit Jacobs explained the initial agreement and the course of negotiations designed to avoid a lawsuit, and he accounted for the varying numbers of shares shown in the settlement agreements. Jacobs swore that the March 7 letter reflected an oral settlement agreement he and Carlson reached at a meeting in late February or early March, 1986.

We find that Jacobs' testimony is not incredible, nor is it significantly less credible than Carlson's testimony. Whether a jury hearing Jacobs' lawsuit against Carlson would choose to believe Carlson or Jacobs is a matter of speculation; there is no evidence that the jury would have believed Carlson. *See Olson v. Aretz*, 346 N.W.2d 178, 183 (Minn.App.1984), *pet. for rev. denied* (Minn.1984). As the court held in *Glenna v. Sullivan*, 310 Minn. 162, 170, 245 N.W.2d 869, 873 (1976):

> To allow a client who becomes dissatisfied with a settlement to recover against an attorney solely on the ground that a jury might have awarded [him] more than the settlement is unprecedented.

If the jury believed Jacobs, the statute of frauds defense would fail because of the March 7 letter. Since Carlson has not presented evidence that could support a finding that the statute of frauds defense would defeat the lawsuit, we need not address the other potential bases Jacobs would have had for avoiding the statute of frauds.

Carlson next claims that he would have won at trial because there was, as a matter of law, no agreement between the parties. Jacobs testified that he and Carlson reached the full and final settlement agreement reflected in the March 7 letter. Again, if the jury believed Jacobs rather

than Carlson, it would find a legally binding agreement for sale of C.O.M.B. stock.

Carlson next contends that respondents caused him harm when they failed to aggressively assert his defenses to Jacobs' lawsuit in the settlement negotiations, and therefore they recommended a settlement that was not as favorable as might have been reached. Carlson argues that, as a general rule, presenting a greater number of defenses in settlement negotiations helps potential defendants reach more favorable settlements, even if the defenses are not legally valid, and therefore there is an issue of fact whether respondents' failure to raise and aggressively pursue the statute of frauds defense caused Carlson to accept an inadequate settlement.

■ There is no evidence from which a jury could conclude that Carlson would have reached a more favorable settlement if respondents had more vigorously advocated Carlson's defenses. In May 1986 Jacobs told his attorney not to settle the lawsuit against Carlson for less than 200,-000 shares of C.O.M.B., and he told the attorney to accept so few shares only if Carlson signed a binding settlement by May 23, 1986. Carlson presented no evidence from which a jury could conclude that Jacobs would not have kept his word. Carlson's generalizations about litigants cannot overcome the evidence directly relating to Jacobs' willingness to settle.

> Conclusory allegations and broad generalities which are unsupported by specific facts * * * are insufficient support for or opposition to a motion for summary judgment.

2 R. Mallen & J. Smith, *Legal Malpractice* § 27.22, at 689 (3rd ed. 1989). Carlson has presented evidence from which a jury could conclude only that he might have achieved a better result, not that he would have achieved a better result, if he had declined the settlement of the lawsuit and allowed Jacobs to bring the case in court. Since this evidence is not sufficient to show that any of respondents' acts proximately caused Carlson harm, the trial court prop-

erly granted respondents' motion for summary judgment on the first count of the complaint.

## II.

In his second claim for relief Carlson alleges that respondents breached their fiduciary duty to him when they represented him in his negotiations with Jacobs and C.O.M.B. without informing him that they also represented JMC, of which Jacobs was principal owner, and Marquette Bank, where Jacobs became a director. Carlson also alleges that respondents had a duty to inform him that they represented Marquette Bank because Jacobs' friend and business associate, Carl Pohlad, was president and a principal owner of Marquette Bank. Pohlad is also a director of C.O.M.B.

Respondents admit that they did not inform Carlson about their representation of JMC. Although Pederson testified that he told Carlson that Fredrikson & Byron represented Marquette Bank, Carlson testified that no one told him about Marquette Bank. Therefore, if respondents had a fiduciary duty to inform Carlson about their representation of JMC, they breached that duty, and if they had a duty to inform Carlson about their representation of Marquette Bank, there is a genuine issue of material fact sufficient to withstand the motion for summary judgment.

Before 1985 a lawyer's professional responsibilities were established by the Minnesota Code of Professional Responsibility, which provided in Canon 9: "A lawyer should avoid even the appearance of professional impropriety."

The United States Court of Appeals for the Eleventh Circuit, in an attempt to clarify the application of the "appearance of impropriety" standard to a motion for disqualification, held:

> [A]lthough proof of actual wrongdoing is not required, there must exist a reasonable possibility that some specifically identifiable impropriety did in fact occur.

*Norton v. Tallahassee Memorial Hosp.,* 689 F.2d 938, 941 (11th Cir.1982).

The Code was replaced by the Minnesota Rules of Professional Conduct. A commentator on the new rules stated:

[T]he test for discipline or disqualification of a lawyer should [never] be simply the "appearance of impropriety." That standard is too vague for fair application, and was accordingly dropped from the Model Rules.

G. Hazard & W. Hodes, *The Law of Lawyering: A Handbook on The Model Rules of Professional Conduct* § 1.7:101, at 219 (2d ed. 1990).

The current rules provide:

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

(2) each client consents after consultation.

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

Minn.R.Prof. Conduct 1.7.

■ The issue presented in this case is not whether respondents' actions constitute an ethical violation, but whether their actions could constitute legal malpractice. Demonstrating that a rule of professional conduct has been violated is not sufficient, by itself, to establish liability for legal malpractice. The Rules of Professional Conduct themselves provide:

Violation of a Rule [of Professional Conduct] should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached. The Rules [of Professional Conduct] are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability.

Minn.R.Prof. Conduct preamble. Evidence sufficient to establish a violation of Rule 1.7 of the Code of Professional Responsibility is not necessarily sufficient to establish a cause of action for legal malpractice.

This court has found no controlling authority for determining when a law firm's failure to inform a client about its representation of another client will result in liability in an action for legal malpractice. However, the Minnesota Supreme Court has considered when a conflict of interest requires disqualification of an attorney or law firm from representing a client. *See Buysse v. Baumann–Furrie & Co.,* 448 N.W.2d 865, 868–69 (Minn.1989); *Jenson v. Touche Ross & Co.,* 335 N.W.2d 720, 731–33 (Minn.1983); *National Texture Corp. v. Hymes,* 282 N.W.2d 890 (Minn.1979). The approach to disqualification issues developed in these cases provides guidance for considering the issue presented here.

The approach to disqualification developed by the Supreme Court includes the following three steps:

(a) Considering the facts and the issues involved, is there a substantial, relevant relationship or overlap between the subject matters of the two representations?

\*　　\*　　\*　　\*　　\*　　\*

(b) If so, then certain presumptions apply: First, it is presumed, irrebuttably, that the attorney received confidences from the former client and he or she will not be heard to claim otherwise. \* \* \* Second, it is also presumed, but subject to rebuttal, that these confidences were conveyed to the attorney's affiliates. \* \* \*

(c) Finally, at this stage, if reached, the court weighs the competing equities.

*Jenson,* 335 N.W.2d at 731–32 (citations omitted).

■■ Liability for legal malpractice for failing to inform one client about representation of another client may not be imposed if, under the same circumstances, a law firm would not be disqualified from representing a client. If, upon consideration of the facts and issues involved, there is not a substantial, relevant relationship or overlap between the subject matters of the representation of two clients, there can be no liability for legal malpractice for failing to inform one client about the representation of the other client.

Accordingly, we must consider the evidence appellant has produced regarding the facts and issues involved in the alleged impermissible representations of JMC and Marquette Bank to determine whether this evidence could support a conclusion that there was a substantial, relevant relationship or overlap between the subject matter of either of those representations and the subject matters upon which respondents represented Carlson. If the evidence could not support this conclusion summary judgment was properly granted because no duty to inform exists absent a substantial, relevant relationship or overlap.

Respondents' Representation of JMC

■ Appellant contends that respondents' representation of JMC while continuing to represent him constituted concurrent representation of clients with adverse interests and was a breach of respondents' fiduciary duty of loyalty to him.

Appellant contends that a breach of fiduciary duty occurred because C.O.M.B., Jacobs, Pohlad, and Deikel were united in interest against him and, by representing JMC, a company in which Jacobs owned an interest, respondents were also representing Jacobs and C.O.M.B. Representing appellant in his dispute with Jacobs and C.O.M.B. while also representing Jacobs and C.O.M.B., appellant argues, was an impermissible conflict of interest.

Appellant does not claim the existence of an impermissible attorney-client relationship in the traditional sense. Instead, appellant argues that, because C.O.M.B., Jacobs, Pohlad, and Deikel were united in interest against him, representing any member of this united front while also representing him would be a conflict of interest for respondents.

Conflict With Jacobs

Appellant's argument overlooks the fact that respondents represented JMC, a corporation which was not a member of the alleged united front. Jacobs was a shareholder in JMC, but representing a corporation does not automatically establish an attorney-client relationship between corporate counsel and the corporation's officers, directors, shareholders and other constituents. *See TJD Dissolution Corp. v. Savoie Supply Co., Inc.* 460 N.W.2d 59, 62 (Minn.App.1990) (record did not support existence of attorney-client relationship between corporation's attorney and shareholder); *see also Schuler v. Meschke,* 435 N.W.2d 156, 162 (Minn.App.1989), *pet. for rev. denied* (Minn. Apr. 19, 1989) (attorney-client relationship did not exist between attorney who provided legal services for cooperative and cooperative members). "A lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents." Minn.R.Prof. Conduct 1.13(a). When respondents were retained by JMC they did not automatically become counsel for Jacobs.

The mere fact that Jacobs was a shareholder in JMC does not establish that there was an impermissible conflict in this case. The matter respondents handled for JMC involved an entertainment law issue. The facts and issues involved in the matter were not related in any way to the dispute between Carlson and Jacobs. There was no evidence that respondents communicated with Jacobs in any way with respect to the work they did for JMC. There was no evidence that Jacobs sought or received any legal advice from respondents. There was no evidence that Jacobs even knew that respondents were retained by JMC. Furthermore, the settlement agreement between Carlson and Jacobs closed on June 9, 1986 and respondents' representation of JMC began on June 19, 1986.

## Conflict With C.O.M.B.

C.O.M.B., like Jacobs, is an entity separate from JMC. Representation of JMC does not automatically establish an attorney-client relationship between JMC's counsel and C.O.M.B. Even under appellant's united front theory, it is necessary to establish a connection between JMC and C.O.M.B. to support the conclusion that respondents' representation of JMC was an impermissible conflict with their representation of Carlson in his dispute with C.O.M.B. As a shareholder in both entities, Jacobs is a link between JMC and C.O.M.B. However, if there is no substantial, relevant relationship or overlap between respondents' representation of JMC and their representation of Carlson in his dispute with Jacobs, there certainly can be no substantial, relevant relationship or overlap between their representation of JMC and their representation of Carlson in his dispute with C.O.M.B. when the only connection between JMC and C.O.M.B. is Jacobs.

We find that the evidence produced by appellant was not sufficient to permit a conclusion that there was a substantial, relevant relationship or overlap between the subject matter of respondents' representation of Carlson and the subject matter of respondents' representation of JMC. Absent a substantial, relevant relationship or overlap between the subject matters of the two representations respondents would not have been disqualified from representing JMC and there can be no malpractice liability for this representation.

## Respondents' Representation of Marquette Bank

Carlson maintained that respondents' representation of him conflicted with respondents' interest in retaining Marquette Bank as a client. Appellant again relies on his united front theory to establish the existence of a conflict of interest between respondents' clients. Appellant argues that by representing Marquette Bank respondents represented Pohlad, and by representing Pohlad respondents represented Jacobs. Once again, appellant's argument overlooks the fact that Jacobs, Pohlad, and Marquette Bank are separate entities. The mere fact that Jacobs and Pohlad have been business associates in the past is not sufficient to establish a substantial, relevant relationship or overlap between the subject matters of respondents' representation of Carlson and their representation of Marquette Bank.

Jacobs became a director of Marquette Bank on June 17, 1986. His status as a director did not make him respondents' client. *See* Minn.R.Prof. Conduct 1.13.

The record in this case is contrary to Carlson's assertions: Fredrikson & Byron performed similar amounts of work for Marquette Bank before, during, and after its representation of Carlson. Carlson has presented no evidence of a substantial, relevant relationship or overlap between respondents' representation of him and their representation of Marquette Bank.

We find that the evidence produced by appellant could not support a conclusion that there was a conflict between respondents' representation of Carlson and their representation of either JMC or Marquette Bank that would have required their disqualification from representing any of these clients. Respondents did not have a duty to inform Carlson that they represented JMC or Marquette Bank. The trial court properly granted respondents' motion for summary judgment on the second count of the complaint.

## DECISION

Carlson failed to present evidence that any of respondents' alleged errors and omissions proximately caused him damage. The evidence shows only that, had Jacobs filed the threatened lawsuit, Carlson might have won, not that he would have won. Respondents had no duty to inform Carlson about their representation of other clients when there was no substantial, relevant relationship or overlap between the subject matters of the representation of those clients and the subject matter of their representation of Carlson. The trial court properly granted respondents summary judgment on both counts of the complaint.

We grant Carlson's motion to strike the deposition of Robert Weinstein from the record on appeal. Minn.R.Civ.App.P. 110.-01. We decline to review the discovery orders and the denial of Carlson's motion for summary judgment on respondents' defenses. Minn.R.Civ.App.P. 103.04.

Affirmed.