# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-2220

_____

Brian F. Leonard; Marshall    *
Investments Corp.; Page State Bank;    *
Mcville State Bank; Ramsey National    *
Bank and Trust of Devils Lake;    *
Security Bank of USA; Ultima Bank    *
Minnesota; First National Bank and    *
Trust Co.; Dacotah Bank; North    *
Country Bank and Trust; First Federal    *
Bank of the Midwest; First American    *
Bank and Trust; Northstate LLC;    *
Security State Bank of Sebeka; First    *
National Bank of the North; First    *
Independent Bank; Citizens State Bank    *
of Roseau; Farmers State Bank; State    *
Bank of Park Rapids; New Auburn    *    Appeals from the United States
Investment Inc.; Peoples State Bank of    *    District Court for the
Madison Lake; Bank of Luxemburg;    *    District of Minnesota.
Lake Country State Bank; Community    *
National Bank; United Community    *
Bank of North Dakota; Choice    *
Financial Group; Security State Bank;    *
Campbell County Bank Inc.; Security    *
First Bank of North Dakota; First State    *
Bank of Bigfork; McIntosh County    *
Bank; Oregon Community Bank and    *
Trust; Bremer Business Finance    *
Corporation,    *
   *
             Plaintiffs-Appellees,    *
   *
v.    *

Dorsey & Whitney LLP, a Minnesota    *
Limited Liability Partnership,    *
   *
       Defendant-Appellant.    *

_____

Nos. 07-2242, 07-2258, 07-2261, 07-2260
_____

Bremer Business Finance Corporation;    *
   *
       Plaintiff-Appellee/    *
       Cross-Appellant,    *
   *
and    *
   *
Brian F. Leonard, Trustee,    *
   *
       Plaintiff-Appellee,    *
   *
      v.    *
   *
Dorsey & Whitney LLP,    *
   *
       Defendant-Appellant/    *
       Cross-Appellee.    *

_____

Submitted: April 17, 2008
Filed: January 15, 2009 **(Corrected 1/22/09)**
_____

Before MURPHY, COLLOTON, and SHEPHERD, Circuit Judges.
_____

SHEPHERD, Circuit Judge.

One of Minnesota's largest law firms is before us, requesting that we overturn judgments that it committed legal malpractice and breached fiduciary duties owed to a client. On its side it has a recent decision of the Minnesota Supreme Court and our duty to conscientiously ascertain and apply state law. We predict that the Minnesota Supreme Court would reverse the judgments against Dorsey & Whitney LLP with instructions to dismiss. We must therefore do the same.

I.

This case is in federal court because the Plaintiffs' claims are related to the Chapter 7 bankruptcy case filed by SRC Holding Corporation, also known as Miller & Schroeder, Inc. (M&S). See 28 U.S.C. § 1334(b). Trustee Brian F. Leonard, on behalf of M&S's bankruptcy estate, brought an adversary complaint against the law firm Dorsey & Whitney LLP (Dorsey), alleging that the firm breached fiduciary duties that it owed to its client M&S. Bankruptcy estate claimant Bremer Business Finance Corporation (Bremer) brought a separate adversary complaint against Dorsey, alleging three claims premised on the theory that Bremer was Dorsey's client. The Trustee joined Bremer's complaint,[1] bringing a claim for indemnity and contribution against Dorsey to offset any monies that Bremer might recover in its claims against the estate.

Dorsey consented to the entry of a judgment by the bankruptcy judge on the Trustee's complaint under 28 U.S.C. § 157(c)(2). Dorsey did not consent to the entry of a judgment on Bremer's complaint, so the bankruptcy judge submitted proposed findings of fact and conclusions of law to the district court. 28 U.S.C. § 157(c)(1). The district court reviewed the bankruptcy judge's decision on the Trustee's complaint as an appeal, 28 U.S.C. § 158(a)(1). It considered the bankruptcy judge's proposed findings and conclusions on Bremer's complaint after reviewing de novo the matters

_____

[1] Although the Trustee is a party to both of the adversary proceedings discussed in this case, for convenience we will refer to the first action as the "Trustee's," and to the second action as "Bremer's."

to which the parties objected. 28 U.S.C. § 157(c)(1). We have appellate jurisdiction over the final decisions of both courts under 28 U.S.C. § 158(d)(1) and 28 U.S.C. § 1291. See In re M & S Grading, Inc., 526 F.3d 363, 368 (8th Cir. 2008).

While the Trustee's and Bremer's claims went forward in the federal courts, parallel litigation involving the same claims and transactions proceeded in the Minnesota state courts. The state-court plaintiffs were 28 banks that had been dismissed from the Trustee's action for lack of subject-matter jurisdiction, and three banks from whose claims the bankruptcy court abstained "in the interest of justice, or in the interest of comity with State courts or respect for State law" under 28 U.S.C. § 1334(c)(1). The claims of the 31 banks were the same as those alleged in Bremer's complaint. As a result of limited federal court jurisdiction, the two actions would decide the same questions of law on a nearly identical set of facts.

Minnesota law supplies the rules of decision for this case. Just as in an action brought under diversity jurisdiction, the doctrine of Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938), governs our application of state law. See FDIC v. Wabick, 335 F.3d 620, 625 (7th Cir. 2003). Under the Erie doctrine, a federal court is bound by the decisions of the state's highest court. HOK Sport, Inc. v. FC Des Moines, L.C., 495 F.3d 927, 934-35 (8th Cir. 2007). If the state's highest court has not clearly spoken, we may rely on the decisions of intermediate state courts, unless we are convinced by persuasive data that the highest state court would decide the issue differently. United Fire & Cas. Ins. Co. v. Garvey, 328 F.3d 411, 413 (8th Cir. 2003) (citing Comm'r v. Estate of Bosch, 387 U.S. 456, 465 (1967)). In attempting to predict state law, a federal court may "consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data . . . ." McKenna v. Ortho Pharm. Corp., 622 F.2d 657, 663 (3d Cir. 1980). Our duty is to conscientiously ascertain and apply state law, not to formulate new law based on our own notions of what is the better rule. See David v. Tanksley, 218 F.3d 928, 930 (8th Cir. 2000); McKenna, 622 F.2d at 663.

As the parallel actions rounded their turns through the courts, Bremer's federal action ran a few lengths behind the 31 banks' state court litigation. The state trial court granted summary judgment in Dorsey's favor, whereas the bankruptcy court denied summary judgment and held a seven-day trial. The bankruptcy court was aware of the state court's decision but unwilling to give it preclusive or persuasive effect. By the time the district court considered Bremer's objections to the bankruptcy court's proposed decision, the Minnesota Court of Appeals had partially reversed the trial court's decision, but the Minnesota Supreme Court had granted further review. McIntosh County Bank v. Dorsey & Whitney, LLP (McIntosh I), 726 N.W.2d 108 (Minn. Ct. App. 2007), rev'd in part, 745 N.W.2d 538 (Minn. 2008). The district court did not rely on either of the state courts' opinions in its consideration of the bankruptcy court's recommendations.

The Minnesota Supreme Court issued its opinion in McIntosh County Bank v. Dorsey & Whitney, LLP (McIntosh II) while this appeal was pending. 745 N.W.2d 538 (Minn. 2008). Unlike the bankruptcy and district courts, we have the advantage of knowing the Minnesota Supreme Court's precise view on some of the questions of law controlling Bremer's claims. Consequently, we must reverse Bremer's case as contrary to the McIntosh II decision, even if we might have thought the district court's predictions of Minnesota law correct when they were made. Vandenbark v. Owens-Ill. Glass Co., 311 U.S. 538, 543 (1941). Not only does McIntosh II tell us how to decide the Bremer case, it also sheds light on the legal relationships among the parties. Because the bankruptcy court's decision is inconsistent with how we predict the Minnesota Supreme Court would characterize those relationships, we must also reverse the Trustee's case.

II.

In a bankruptcy adversary proceeding tried on the merits without a jury, "the court must find the facts specially and state its conclusions of law separately." Fed.

R. Civ. P. 52(a)(1); Fed. R. Bankr. P. 7052.  The rule only requires that the trial court set forth its reasoning with enough clarity that the appellate court may understand the basis of the decision.  Century Marine Inc. v. United States, 153 F.3d 225, 231 (5th Cir. 1998); Sierra Fria Corp. v. Donald J. Evans, P.C., 127 F.3d 175, 180 (1st Cir. 1997).  Witness-by-witness particularity and expansive dissertations of law are unnecessary. Century Marine, 153 F.3d at 231; Sierra Fria, 127 F.3d at 180.  "Ideally, findings of fact should be clear, specific, and complete, without unrealistic and uninformative generality on the one hand, and without an unnecessary and unhelpful recital of nonessential details of evidence on the other."  9C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2579 at 330 (3d ed. 2008).  We will not set aside a factual finding unless it is clearly erroneous and we will "give due regard to the trial court's opportunity to judge the witnesses' credibility." Fed. R. Civ. P. 52(a)(6).

Rule 52(a) does not, however, "inhibit an appellate court's power to correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law."  Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 501 (1984).  We will overturn a factual finding that is based on the application of an erroneous legal standard.  Shull v. Dain, Kalman & Quail, Inc., 561 F.2d 152, 155 (8th Cir. 1977).  So long as we give proper deference to the trial court's credibility determinations, we may independently review the entire record to the degree necessary to correct legal error.  See Bose Corp., 466 U.S. at 499-501.

With this standard in mind, we must restate the trial courts' factual findings[2] in a manner consistent with our duty to correctly apply Minnesota law.  We set aside factual findings derived from erroneous legal assumptions, see id. at 501 n.17, and we

---

[2] We review the bankruptcy court's findings as to the Trustee action and the district court's findings as to the Bremer action.

consult the record for undisputed facts omitted from the trial courts' Rule 52(a) findings but material to the outcome of this case. We do not disturb the trial courts' credibility determinations, see Anderson v. City of Bessemer City, 470 U.S. 564, 575 (1985), except that we disregard immaterial factual findings.

## III.

M&S was a Minneapolis-based investment banking firm. One of its key lines of business was to arrange loans for Indian tribes. M&S would serve as the lead lender; after closing the loan it would sell participation interests in the loan to other lenders, mostly small local banks. Because it normally sold 100% of the loans to participants, M&S's revenue came from the placement fee paid by the Tribe and servicing fees the participants paid M&S to administer the loans.

In February of 1999, M&S closed the "St. Regis II" loan to President R.C.–St. Regis Management Company (President) in the amount of $3,492,000.[3] President was a New York general partnership formed to manage a casino on the reservation of the St. Regis Mohawk Tribe (the Tribe) in Hogansburg, New York. President would construct the facilities, arrange for funding, and manage the casino operations. The Tribe would pay President 25% of the net revenue from the casino as a management fee and committed to repay President for the construction and development costs out of the remaining 75%. The St. Regis II loan was secured by President's interest in the Tribe's payments from casino revenue.

M&S retained Dorsey to assist in documenting the loan. Dorsey had assisted M&S in dozens of transactions and was familiar with M&S's business methods; there was no written agreement as to Dorsey's representation. Before closing the loan,

_____

[3] The St. Regis I loan was for $8,624,000 and for our purposes structured identically to the St. Regis II loan. The claims in this case deal principally with the St. Regis II loan.

Dorsey internally questioned whether some of the documents required approval by the National Indian Gaming Commission (NIGC) to be enforceable. Dorsey did not disclose the internal debate to M&S. The bankruptcy court found that Dorsey lawyers believed that, due to the risk of the documents being voided, the loan should not be closed until the NIGC approved of the loans or determined that approval was not required.

On February 16, 1999, the NIGC informed President and the Tribe that it would probably not approve the documents before the planned closing date. Dorsey advised M&S that approval of the loans was not needed. Although one lawyer testified that she orally advised M&S of the risks involved in closing without NIGC approval, the bankruptcy court found her not credible. The court credited the testimony of M&S personnel who stated that if M&S had known of the risk, it would not have closed the loans. M&S closed the loans on February 24, 1999.

Prior to closing, M&S had received commitments from participating banks to fund 100% of the two loans, including a $2,000,000 (approximately 57%) participation from Bremer. M&S sent a memorandum to the participants recommending that the loans be closed without NIGC approval, while also expressing its opinion that NIGC approval was imminent. The district court found no evidence that Bremer received the memorandum.

Bremer executed a Participation Agreement with M&S in May of 1999, although the text of the Agreement says it was effective on March 1, 1999. The Agreement defines the parties' relationship as "that of a seller and purchaser of a property interest," and authorized M&S "to be named as the nominal payee of the Note and . . . to generally act as agent for all the Participants . . . ." Paragraph 3.1 of the Agreement set forth Bremer's acceptance of the risk it was taking by participating in the St. Regis II loan:

Participant has received and made a complete examination of copies of all Loan Documents it requires to be examined and approves of the form and content of the same. Participant acknowledges that Participant has been provided with or granted access to all of the financial and other information that Participant has requested or believes to be necessary to enable Participant to make an independent and informed judgment with respect to the Collateral, Borrower and any Obligor and their credit and the desirability of purchasing an undivided interest in the Loan. Participant has, without reliance on Lender and based upon such documents and information as the Participant has deemed appropriate, made its own credit analysis and decision to purchase its participation interest in the Loan.

The same paragraph went on to specify that Bremer was not relying on any statements made by M&S during the course of the marketing, offering, or negotiation of the Participation Agreement:

Participant is participating with Lender based upon Participant's own independent examination and evaluation of the Loan transaction and the information furnished with respect to Borrower and without any representations or warranties from Lender as to the Borrower's financial suitability, the appropriateness of the investment and the value and security of the Collateral. . . . PARTICIPANT ACKNOWLEDGES THAT LENDER MAKES NO WARRANTY OR REPRESENTATION AND SHALL NOT BE RESPONSIBLE FOR ANY STATEMENT, WARRANTY OR REPRESENTATION MADE IN CONNECTION WITH THE COLLATERAL OR ANY DOCUMENT IN CONNECTION WITH THE LOAN. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, PARTICIPANT ACKNOWLEDGES THAT LENDER HAS MADE NO GUARANTY OF REPAYMENT, IT BEING UNDERSTOOD PARTICIPANT SHALL LOOK ONLY TO BORROWER, ANY OBLIGOR AND TO THE COLLATERAL FOR REPAYMENT OF THE LOAN.

M&S's duty under the Agreement was to administer the loan for Bremer's benefit "in accordance with the customary policies and procedures under which it

administers loans for its own account." The Agreement obligated M&S to "enforce any remedies under the Loan Documents . . . and in furtherance thereof may select counsel and other professionals of its choice . . . ." Bremer was required to pay its portion of any litigation expenses, including attorneys' fees. The Agreement provided that M&S "shall not be responsible for any negligence or misconduct on the part of any accountant, attorney, . . . or other expert or be bound to supervise the proceedings of any such appointee provided that Lender shall use reasonable care in the selection of such person or firm." The Participation Agreement was a standard form agreement originally drafted by M&S's in-house counsel. Bremer advanced its $2,000,000 participation on April 6, 1999.

The casino opened in April of 1999, but had difficulty making money. By February of 2000, President defaulted on its payment obligations. Two months later, the Tribe revoked President's management rights. On October 3, 2000, a Dorsey lawyer and representatives from M&S and Bremer met with the Tribal Council to discuss a possible resolution of the unpaid loans. At the meeting, the Tribe's Chief suggested for the first time that the loan documents were unenforceable against the Tribe because they had not been approved by the NIGC. Three days later, M&S sent a letter to the participants repeating Dorsey's opinion that the Tribe's position as to the need for NIGC approval was incorrect.

The same day as the meeting, Dorsey filed a lawsuit on M&S's behalf in the United States District Court for the District of Minnesota against President for the collection of unpaid loan amounts and against the Tribe for an accounting of casino revenue. The Tribe was later dismissed from the lawsuit. In April of 2002, the court in that action entered a judgment against President in the amount of $4,505,043.75 on the St. Regis II loan. Three years later, Bremer and the other participants entered into a settlement with the Tribe in which the Tribe paid Bremer $650,000 for an assignment of its interest in the President judgment.

Soon after the President lawsuit was filed, Dorsey began to prepare for possible claims of the participants against M&S. On December 7, 2000, Bremer showed Dorsey a draft complaint against M&S, alleging that M&S defrauded it by fraudulently misrepresenting that the loan had received NIGC approval when it had not. Some of the allegations suggested that Dorsey's advice as to the need for NIGC approval had been erroneous. Around the same time, M&S voluntarily dismissed the claim against the Tribe in the President litigation. The bankruptcy court concluded that the decision to drop the claims against the Tribe was made by Dorsey to conceal its "potential malpractice" as "a pattern of avoiding a situation where it would have to actually prove up the validity" of the St. Regis II loan documents.

Dorsey's lead counsel in the President litigation sent a memorandum to Dorsey's internal ethics counselor and loss management partner requesting an opinion on whether Dorsey was disqualified from representing M&S against Bremer because one of its lawyers might be a fact witness as to the closing of the St. Regis II loan. In the memorandum, the lead counsel mentioned that another firm was lobbying M&S to represent them on the issue, "but I would obviously prefer to keep all of this within the firm to the extent we can." The ethics and loss management lawyers advised that the firm could continue to represent M&S.

Through its counsel at Dorsey, M&S responded to Bremer's draft complaint. The lawyer wrote that M&S "concluded with the concurrence of my firm that NIGC approval was not required with respect to the loan documents . . . ." The letter also referred to the memorandum M&S had sent to the participants recommending that the loans be closed without NIGC approval. After modifying its draft complaint to remove references to the Dorsey firm, Bremer filed a lawsuit against M&S in a Minnesota state court on December 21, 2000. Bremer alleged claims for fraud in the inducement, negligent misrepresentation, and breach of contract; it asked for rescission of the Participation Agreement and damages. Bremer's state court lawsuit was stayed when M&S filed for Chapter 7 bankruptcy protection.

IV.

Brian Leonard was appointed Trustee to administer M&S's bankruptcy estate. Bremer filed a timely proof of claim against the estate. It later filed an adversary complaint against Dorsey, alleging legal malpractice, negligent misrepresentation, and breach of contract. At the heart of Bremer's complaint was the theory that Bremer was Dorsey's client or a third-party beneficiary of Dorsey's services. The Trustee joined the complaint, claiming that the estate was entitled to indemnity or contribution from Dorsey to the extent that Bremer failed to recover directly.

Along with M&S's successor in interest, Marshall Investments Corporation (Marshall), the Trustee had previously brought his own complaint against Dorsey on behalf of the estate. Marshall and the Trustee claimed that Dorsey breached its fiduciary duty to M&S by failing to disclose: (1) it had a conflict of interest in representing M&S in a lawsuit against a participant; and (2) M&S had a third-party claim against Dorsey that it could assert in the suit brought by a participant. At least some of the Trustee's allegations were based on the assumption that the loan participants were Dorsey's clients or third-party beneficiaries of Dorsey's services.

The bankruptcy court held a seven-day trial on both complaints. Six months later, it issued a 146-page decision, which contained findings of fact and conclusions of law. According to the bankruptcy court, Bremer and Dorsey had a direct attorney-client relationship at the time of the St. Regis loan closings. Alternatively, the court found that Bremer had standing to sue Dorsey for legal malpractice as a third-party beneficiary of the attorney-client contract between M&S and Dorsey. It then concluded that Dorsey committed malpractice by closing the St. Regis II loan without first obtaining NIGC approval. The bankruptcy court recommended that the district court enter a judgment of $1,759,000 on Bremer's malpractice and breach of contract claims, and dismiss the negligent misrepresentation claim. It reached that figure by adding the original $2,000,000 participation and the $409,000 in fees and expenses

for pursuing the state-court action against M&S, then subtracting the $650,000 settlement with the Tribe. The court recommended that the Trustee's claim for indemnity and contribution be dismissed as moot.

On the Trustee's action, the bankruptcy court found that Dorsey breached its fiduciary duties of loyalty and full disclosure to M&S. Based on its conclusion that Dorsey represented Bremer in both the drafting of the St. Regis II documents and the President litigation, the court found that Dorsey's representation of M&S in Bremer's state-court lawsuit was directly adverse to a current client without that client's consent. It also found that Dorsey failed to disclose that it may have committed malpractice by closing the St. Regis II loan without NIGC approval. According to the bankruptcy court, Dorsey's ongoing representation of M&S was materially conflicted by Dorsey's interest in avoiding malpractice liability. It further found that the breach was "a blatant conflict of interest constituting a lack of good faith," and that Dorsey's attorneys acted with "fraudulent or ill-intent." The bankruptcy court ordered disgorgement of all attorneys' fees and expenses paid in the Bremer and President litigations, entering a total judgment of $836,344.32 for the Trustee and $51,099.88 for Marshall.

Dorsey objected to the bankruptcy court's proposed findings and conclusions of law in Bremer's action and appealed its judgment in the Trustee's action. On de novo review of Bremer's action, the district court determined that Bremer did not become Dorsey's client until Dorsey began work on the President litigation in June of 2000. It found that Dorsey committed malpractice representing Bremer in the President litigation without disclosing that it had been negligent in the closing of the St. Regis loans. According to the court, "but for Dorsey's negligence, Bremer would have obtained a more favorable result, as it would have sued Dorsey instead of pursuing collection of the loan from President, who was judgment proof anyway." The court awarded Bremer $409,000 for the costs incurred in the state-court litigation against M&S; it declined to award Bremer a return on its $2,000,000 stake in the St.

Regis II loan. The district court dismissed the negligent misrepresentation claim and the Trustee's claim for indemnity and contribution.

Reviewing the judgment in the Trustee's action under a clear-error standard, the district court affirmed the decision of the bankruptcy court. The district court diverged slightly from the bankruptcy court's view of the standard of care, holding that Dorsey was required to delay the closing until the NIGC finished its review of the documents related to the St. Regis II loans. In other words, it believed that a reasonable lawyer would have known that the validity of the documents without NIGC advice was uncertain and advised the client to await the NIGC's determination. The district court agreed that failure to disclose the malpractice claim was a breach of fiduciary duty and affirmed the bankruptcy court's remedy of full fee disgorgement.

Dorsey appeals the district court's judgment for Bremer and the bankruptcy court's judgment in favor of the Trustee and Marshall. Bremer cross-appeals, requesting that we adopt the bankruptcy court's view and increase the judgment against Dorsey to $1,759,000.

V.

Considering *sua sponte* our jurisdiction over this appeal, the dissent concludes that this case must be dismissed. We disagree. According to the dissent, we lack jurisdiction over this matter pursuant to 28 U.S.C. § 1291, the jurisdictional basis asserted by Dorsey, because the district court did not resolve the Trustee's claim for indemnity and contribution against Dorsey.[4] However, the standard for finality under

---

[4]The Trustee's claim against Dorsey for indemnity and contribution is not what we have referred to as the "Trustee's action." Rather, it is a claim asserted by the Trustee in what we have termed "Bremer's action." None of the parties have appealed the district court's dismissal of the Trustee's claim for indemnity and contribution.

-14-

section 1291 has been met because the district court dismissed the Trustee's indemnity and contribution claim.

"Under § 1291, the courts of appeal have jurisdiction over 'all final decisions of the district courts of the United States.'" Alpine Glass, Inc. v. Ill. Farmers Ins. Co., 531 F.3d 679, 681 (8th Cir. 2008). "A district court's order is a 'final decision' for the purposes of § 1291 if it 'ends the litigation on the merits and leaves nothing more for the [district] court to do but execute the judgment.'" Id. (quoting Green Tree Fin. Corp.-Ala. v. Randolph, 531 U.S. 79, 86 (2000)).

In its report and recommendations, the bankruptcy court concluded that an attorney-client relationship existed between Bremer and Dorsey at the time of the "St. Regis II" loan closing and that Dorsey committed malpractice, entitling Bremer to an award of damages directly from Dorsey and "probably resulting in the elimination of Bremer's claim against the estate." In re SRC Holding Corp., 352 B.R. 103, 182 (Bankr. D. Minn. 2006). In light of this decision, the bankruptcy court recommended the dismissal of the Trustee's indemnity and contribution claim. Id.

Only Dorsey filed objections to the bankruptcy court's report and recommendations, and its objections did not encompass the recommended dismissal of the Trustee's indemnity and contribution claim. In reviewing non-core proceedings, like the Trustee's indemnity and contribution claim, "[t]he district court shall make a de novo review upon the record . . . *of any portion of the bankruptcy judge's findings of fact or conclusions of law to which specific written objection has been made*," Fed. R. Bankr. P. 9033(d) (emphasis added), "[w]ithin 10 days of being served with a copy of the proposed findings of fact and conclusions of law," Fed. R. Bankr. P. 9033(b). The district court's April 6, 2007, order resolved Dorsey's objections, affirming in part and reversing in part the bankruptcy court's report and recommendations. As relevant here, the district court determined that Bremer's direct attorney-client relationship with Dorsey was established after the closing of the "St.

-15-

Regis II" loan, rather than at the time of Dorsey's retention as the bankruptcy court found. Because no party objected to the bankruptcy court's recommendation that the Trustee's indemnity and contribution claim be dismissed, the dismissal became final and effective. See In re Ragar, 3 F.3d 1174, 1177-78 (8th Cir. 1993) (recognizing that where a bankruptcy court makes proposed findings of fact and conclusions of law in a non-core proceeding "[i]ts action would . . . become final and effective if [a party] [did] not file[] timely objections") (citing Fed. R. Bankr. P. 9033(d)); Hagan v. Okony, No. 1:08-cv-732, 2008 WL 4722747, at *1 (W.D. Mich. Oct. 22, 2008) (stating that where no party files objections to the bankruptcy court's report and recommendation, it "stand[s] without objection"). This conclusion is further strengthened by caselaw applying the Federal Magistrates Act's[5] ten-day written-objection provision mirroring Rule 9033(d), 28 U.S.C. § 636(b)(1).[6]

"The language of Bankruptcy Rule 9033(b) is nearly identical to that of Federal Rule of Civil Procedure 72(b) [which implements section 636(b)(1)]. Indeed, the drafters of Rule 9033(b) indicated that the rule 'is derived from [Rule 72(b)], which governs objections to a recommended disposition by a magistrate.'" In re Nantahala Village, Inc., 976 F.2d 876, 879-80 (4th Cir. 1992) (quoting Fed. R. Bankr. P. 9033(b) advisory committee notes). Thus, the Fourth Circuit determined that "a bankruptcy court's proposed resolution should be given the same effect as a magistrate's proposed

---

[5]28 U.S.C. §§ 631-639.

[6]Section 631(b)(1), in pertinent part, provides that:

Within ten days of being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate.

28 U.S.C. § 636(b)(1).

resolution as far as an adversely affected party's responsibilities are concerned." Id. at 880. This court takes the same view. See Ragar, 3 F.3d at 1177-78 (stating that, where a bankruptcy court "viewed itself . . . as making proposed findings of fact and conclusions of law in a non-core proceeding," it "acted much as a magistrate judge would have on a matter lawfully assigned to him or her for a report and recommendation under 28 U.S.C. § 636").

It follows that the Supreme Court's observation that section 636(b)(1) "provide[s] for de novo review *only* when a party objected to the magistrate's findings or recommendations," Peretz v. United States, 501 U.S. 923, 939 (1991) (emphasis added), applies equally here, as does the Court's determination that the failure to file objections eliminates not only the need for de novo review, but *any* review by the district court. See Thomas v. Arn, 474 U.S. 140, 150 (1985) ("We are therefore not persuaded that [section 636(b)(1)] requires some lesser review by the district court when no objections are filed."). In this vein, the First Circuit observed:

> Plaintiff also objects to the award of statutory costs to defendant DiMeo. Unfortunately, his objection comes too late. After the magistrate-judge issued his report, plaintiff had ten days to file written objections to the Report and Recommendation. We find no evidence in the record that plaintiff objected to the magistrate-judge's findings and recommended disposition. Failure to raise objections to the Report and Recommendation waives the party's right to review in the district court . . . .

Davet v. Maccarone, 973 F.2d 22, 30-31 (1st Cir. 1992) (citations omitted); see Henley Drilling Co. v. McGee, 36 F.3d 143, 150-151 (1st Cir. 1994) (holding that objections are required to challenge magistrate judge's findings, as well as magistrate's failure to make additional findings); Lewry v. Town of Standish, 984 F.2d 25, 27 (1st Cir. 1993) (stating that "[o]bjection to a magistrate's report preserves only those objections that are specified"); Templeman v. Chris Craft Corp., 770 F.2d 245, 247 (1st Cir. 1985) ("Absent objection by the plaintiffs, the district court had a

right to assume that plaintiffs agreed to the magistrate's recommendation."). Thus, the failure of both the Trustee and Bremer to object to the bankruptcy court's recommended dismissal waived their right to *any* review by the district court.

Bremer then filed a motion to alter or amend the district court's judgment pursuant to Federal Rule of Civil Procedure 59(e), requesting that the district court address the Trustee's indemnity and contribution claim. However, as the district court recognized, Bremer was too late. See United States v. Metro. St. Louis Sewer Dist., 440 F.3d 930, 934-35 (8th Cir. 2006) ("This court has consistently held that Rule 59(e) motions cannot be used to introduce new evidence, tender new legal theories, or raise arguments which could have been offered or raised prior to the entry of judgment."). "Federal Rule of Civil Procedure 59(e) provides a means 'to support reconsideration [by the court] of matters properly encompassed in a decision on the merits.' Under rule 59(e), the court may reconsider issues previously before it, and generally may examine the correctness of the judgment itself[.]" Ray E. Friedman & Co. v. Jenkins, 824 F.2d 657, 660 (8th Cir. 1987) (quoting White v. N.H. Dep't of Employment Sec., 455 U.S. 445, 451 (1982) (citations omitted)). Because Bremer did not raise the issue prior to the district court's April 6th order, it could not "use rule 59(e) to expand the judgment to encompass new issues." See Friedman, 824 F.2d at 660.

In denying Bremer's Rule 59(e) motion, the district court noted that, as a result of its conclusions in the April 6th order, the Trustee's indemnity and contribution claim was not moot and that it had "not 'adopt[ed]' the bankruptcy court's recommendation to dismiss the claim *as moot*." In re SRC Holding Corp., No. 06-3962, 2007 WL 1464385, at *4 (D. Minn. May 15, 2007) (unpublished) (emphasis added). However, the district court did *not* state that it had *not* dismissed the indemnity and contribution claim for a different reason. Id. Rather, the district court explained that it had dismissed the claim because Bremer and the Trustee had waived their right to review of the dismissal by failing to object to the bankruptcy court's

recommendation pursuant to Rule 9033(b) and (d). Id. The district court also observed that, even if it had analyzed the indemnity and contribution claim in the April 6th order, as opposed to simply adopting the dismissal recommendation, it would have dismissed the claim as premature. Id. at *1; see Henning v. Amsted Indus., Inc., 56 F.3d 29, 31 (7th Cir. 1995) (stating that the "petition for indemnity was premature" because "[d]eclaratory relief as to indemnity is unavailable if liability in the underlying action has not been established" such that "[u]ntil there was a determination that [the claimant] had suffered any loss or incurred any liability, [it] could not enforce the indemnity against [the appellee]" (quotation omitted)); Helena Marine Serv., Inc. v. Sioux City & New Orleans Barge Lines, Inc., 564 F.2d 15, 17 (8th Cir. 1977) ("[T]he Court does not perceive that claimant has a cause of action against Helena Marine Service under its claim of indemnity unless and until it has completed the proceedings in the state court, resulting in judgment against claimant, which claimant has paid. Until these matters have been finally determined, a cause of action for indemnity would be premature."). Thus, the district court's dismissal of the Trustee's indemnity and contribution claim was not undermined by the fact that the claim was not moot.

First, pursuant to Rule 9033(d), Bremer and the Trustee waived their right to contest the bankruptcy court's dismissal recommendation by failing to object.[7]

_____

[7]The district court also noted that, "[e]ven after briefing was complete," it had provided the Trustee and Bremer with another opportunity to raise the indemnity and contribution claim, but both parties failed to do so. In re SRC Holding Corp., No. 06-3962, 2007 WL 1464385, at *3-4 (D. Minn. May 15, 2007) (unpublished). The district court explained that it "sent a letter to the parties asking them to be prepared to address certain issues at oral argument," including: "If the Court finds that a direct attorney-client relationship was formed when paragraph 4.8 of the [Participation] Agreement was invoked, what effect would that have on the issue of damages, and the proper measure of damages." Id. (quoting January 23, 2007 letter). However, "[a]t the February 7, 2007 oral argument, neither Bremer nor the Trustee objected or raised the issue that if the [District] Court made such a finding the issues of indemnity and/or contribution would need to be addressed." Id. at *4.

Though the dissent states that we have incorrectly interpreted the district court's orders in determining that waiver was a basis for the dismissal of the indemnity and contribution claim, the district court expressly stated, in its denial of the Rule 59(e) motion, that "[b]ecause neither Bremer nor the Trustee objected or raised an issue as to the bankruptcy court's conclusions regarding the Trustee's indemnity and/or contribution claims, they waived their right to contest those conclusion, or at a minimum, any issue as to the conclusions [was] not properly in front of the [District] Court." In re SRC Holding Corp., 2007 WL 1464385, at *4. The district court went on to state that "even if there is some evidence in the record to support Dorsey's liability to [M&S], any theory or argument as to the Trustee's indemnity and/or contribution claims have been waived here, or in any event were not properly raised before the [District] Court." Id.

The district court also explained why, though a shift in the legal basis for the dismissal of the Trustee's indemnity and contribution claim had occurred, the district court did not address this in its April 6th order. The district court stated that neither the Trustee nor Bremer "raise[d] a contingent objection asserting that if the [District] Court disagreed with the bankruptcy court's recommendation, the indemnification and/or contribution claims would need to be addressed." Id. at *3. Thus, the district court did not discuss its reasoning for its dismissal of the Trustee's indemnity and contribution claim in its April 6th order because there was no need for it to do so. See Fed. R. Bankr. P. 9033(b), (d); Peretz, 501 U.S. at 939; Thomas, 474 U.S. at 150; In re Ragar, 3 F.3d at 1177-78; Davet, 973 F.2d at 30-31; Hagan, 2008 WL 4722747, at *1.

Second, the Trustee's indemnity and contribution claim has not accrued and thus was premature because "[t]he Trustee has no basis to recover contribution or indemnity from Dorsey until [M&S's liability to Bremer] has been proven." In re SRC Holding Corp., 2007 WL 1464385, at *1; see E.S.P., Inc. v. Midway Nat'l Bank of St. Paul, 447 N.W.2d 882, 885 (Minn. 1989) ("Although under the Uniform Commercial Code Midway is entitled to be indemnified for any loss it sustains, its

claim for indemnification does not ripen until it has sustained a loss–here, when it is compelled to pay E.S.P., Inc. The contingency giving rise to the indemnity claim does not occur until loss is experienced by the indemnitee."); Calder v. City of Crystal, 318 N.W.2d 838, 841 (Minn. 1982) (providing that a claim for contribution or indemnity generally does not arise until payment is made); Bunce v. A.P.I., Inc., 696 N.W.2d 852, 857 (Minn. App. Ct. 2005) ("It is settled law that a claim for contribution does not accrue or mature until the person entitled to the contribution has sustained damage by paying more than his fair share of the joint obligation."). The district court explained that, while Bremer had filed claims in the M&S Chapter 11 bankruptcy case, "[n]o court has tried the issues of [M&S's] liability to Bremer and Dorsey's liability for contribution and indemnity to the Trustee." In re SRC Holding Corp., 2007 WL 1464385, at *1. Further, with respect to Bremer's claim against M&S, the precursor for liability on Dorsey's part to M&S, the district court observed that "[M&S's] liability was not fixed by the filing of the proofs of claims" because "[t]he Trustee has not waived any right to object on any basis to Bremer's proofs of claims and deny liability. In fact, the Trustee can still object to Bremer's proofs of claims, which may result in litigation over the substantiation of [M&S's] underlying liability." Id. at *3.

Therefore, contrary to the dissent's suggestion that, if this appeal were dismissed for lack of jurisdiction, the district court would take some further action with respect to the Trustee's indemnity and contribution claim, the district court has ended its handling of the claim:

> The Court notes that Bremer's initial action against [M&S's] filed in bankruptcy court is currently stayed. It is the belief of this Court that the bankruptcy court may choose to lift the stay and litigate [M&S's] liability to Bremer in that case, litigate the issue based on any objection filed contesting Bremer's proofs of claims, or consolidate the two matters and litigate the issue. Either way, [M&S's] liability is not properly before this Court at this time, and therefore, the Court refrains from making any findings as to such liability.

<u>Id.</u> at *3 n.4.

In sum, the district court accepted the bankruptcy court's recommendation that the indemnity and contribution claim be dismissed, without discussion, because none of the parties objected to the recommendation. In denying Bremer's Rule 59(e) motion, the district court further explained that, even if Bremer and the Trustee had not waived their right to review of the indemnity and contribution claim, the claim was properly dismissed because it was premature in that the Trustee had no basis to recover contribution or indemnity from Dorsey where M&S's liability to Bremer had not been proven. Accordingly, if we were to dismiss this appeal for lack of jurisdiction, the district court would do nothing with regard to the Trustee's indemnity and contribution claim because it has nothing left to do. It has dismissed the claim, and the federal courts await the possible future filing of an action by the Trustee against Dorsey for contribution and indemnity once that cause of action accrues, if ever, by the legal recognition of the liability of the bankruptcy estate to Bremer. Therefore, because the district court's judgment in this matter is a final order in that it ended the Bremer litigation on the merits and leaves nothing more

for the district court to do but execute the judgment, we possess jurisdiction over this appeal. <u>See</u> <u>Alpine Glass</u>, 531 F.3d at 681.

VI.

Between the time of the district court's decision and oral argument in this case, the Minnesota Supreme Court decided <u>McIntosh II</u>. 745 N.W.2d 538. The plaintiffs in <u>McIntosh II</u> were 31 banks that bought participation interests in the St. Regis loans from M&S. <u>Id.</u> at 542. After the bankruptcy court dismissed their cases for jurisdictional reasons, they filed an action against Dorsey in the Hennepin County, Minnesota district court. <u>Id.</u> at 544. They alleged claims of legal malpractice, negligent misrepresentation, breach of contract, and breach of fiduciary duty. <u>Id.</u> The banks voluntarily dismissed the breach of fiduciary duty claim. <u>Id.</u>

The trial court granted Dorsey's motion for summary judgment as to the remaining three claims. Id. On appeal, the Minnesota Court of Appeals affirmed the decision on the negligent misrepresentation claim and part of the legal malpractice claim. McIntosh I, 726 N.W.2d 108, 118-20 (Minn. App. 2007). The Court of Appeals reversed summary judgment on the malpractice and breach of contract claims on the theories that the banks were third-party beneficiaries of Dorsey's representation of M&S and that the banks had an implied contract with M&S. Id. at 114-19. The Minnesota Supreme Court agreed to review the McIntosh I decision. See McIntosh II, 745 N.W.2d at 538.

The Minnesota Supreme Court reversed the Court of Appeals in part, holding that the trial court appropriately granted summary judgment in Dorsey's favor on the third-party beneficiary and implied contract theories. Id. at 545-49. The Court began by reiterating the general rule that, absent fraud or another improper motive, "an attorney is liable for professional negligence only to a person with whom he has an attorney-client relationship. If an attorney were to owe a duty to a nonclient, it could result in potential ethical conflicts for the attorney . . . ." Id. at 545 (citation omitted). In Minnesota, a lawyer can only be found to have a duty to a third party who is a direct and intended beneficiary of the lawyer's services. Id. at 547.

Elaborating on the meaning of "direct and intended beneficiary," the Court held that the transaction must have "as a central purpose an effect on the third party and the effect [must be] intended as a purpose of the transaction." Id. at 547. Further, the lawyer must be aware of the client's intent to benefit the third party. McIntosh II, 745 N.W.2d at 548. The Court said that this requirement reduced the risk of lawyers "dampening their zealous advocacy on behalf of clients, for fear of harming a third party to whom a duty might later be found to be owed." Id.

Finding the situation of the bank participants "far from the will-drafting context in which the third-party beneficiary theory was first developed," the Court concluded that the banks "were not direct and intended beneficiaries of the attorney-client

relationship between M & S and Dorsey." Id. In the Court's opinion, the purpose of Dorsey's legal work was not to benefit the banks, but to close the St. Regis loans. Id. Even if Dorsey was aware of M&S's participation model and M&S expected Dorsey's work to benefit the banks, the Court held, to incur liability Dorsey would need to be aware that the banks were the intended beneficiaries of its services. Id.

The Court concluded that the record before it did not indicate that Dorsey was aware of that intent. McIntosh II, 745 N.W.2d at 548. Although M&S asked Dorsey for some advice in revising the Participation Agreement, the Court found:

> [T]here is no indication that this advice was more than an incidental part of Dorsey's representation. The names of the Bank Participants were not included in any of the instruments Dorsey drafted. No Bank Participant met with Dorsey attorneys prior to or at closing. There was no communication between the Bank Participants and Dorsey before or at closing.

Id. Having quoted significant portions of the Participation Agreement, the Court noted that the banks had acknowledged that they bought the participations based on their own independent evaluations of the loans. Id. at 542, 548.

Rather than considering them third-party beneficiaries of Dorsey's legal work in the St. Regis transactions, the Court suggested that the banks' "only relationship to the proposed transaction was that of parties with whom [Dorsey's] clients might negotiate a bargain at arm's length." Id. at 548 (quoting Goodman v. Kennedy, 556 P.2d 737, 743 (Cal. 1976)). It held that the record was "not sufficiently probative of a third-party beneficiary relationship to allow reasonable persons to draw different conclusions." Id. at 548-49.

Both Dorsey and Bremer have advised us of the McIntosh II decision. See Fed. R. App. P. 28(j). Dorsey argues that it supports reversal of Bremer's judgment against

it; Bremer contends that the record before us is different from the one before the Minnesota Supreme Court in McIntosh II.

VII.

Both the Minnesota Supreme Court's core holding and its suggestion that the relationship between M&S and the participating banks was an "arm's length" dealing contrast mightily with the analyses of the bankruptcy and district courts. In a footnote, the district court asserted that "Miller & Schroeder had loyalties to both President and to the bank lender/participants, whose interests were not necessarily aligned. And through Miller & Schroeder's acquiescence with President's push for closing, Miller & Schroeder evidenced that its loyalties to President prevailed." This statement by the district court implies that M&S owed a duty of care and loyalty to the bank participants even before they advanced funds to participate in the loans.

In McIntosh II, the Minnesota Supreme Court quoted key parts of the Participation Agreement and emphasized the participants' independent evaluation of the loans without reliance on M&S. Id. at 542, 548. But when the district court quoted the language of the Participation Agreement, it expressed its doubt as to the language's efficacy:

While the disclaimers in the Participation Agreement play no part in the Court's determination as to Bremer's standing, the Court notes that it would have no difficulty finding that these disclaimers do not protect Miller & Schroeder from the bank lender/participants' claims, as the Court seriously questions whether Miller & Schroeder, acting as a dual agent with conflicting loyalties, acted in good faith or exercised reasonable judgment.

The Minnesota Supreme Court took the disclaimers as evidence that the banks were

-25-

not intended beneficiaries of Dorsey's work.

Whereas the Minnesota Supreme Court was unwilling to hold Dorsey liable to the loan participants, the bankruptcy court concluded as a matter of public policy that Dorsey should be held liable:

[I]f Dorsey can escape liability for activities that constitute malpractice in this situation on a standing defense, the integrity of these types of commercial transactions are at risk. . . . It cannot be sued for malpractice by the loan participants because they do not have standing; it cannot be sued by Miller & Schroeder because Miller & Schroeder has no damages.

There was obviously a broad discrepancy between how the courts below characterized the loan participation relationship between M&S and Bremer and how the Minnesota Supreme Court viewed the matter. As we seek to decide this case in the same manner as would the latter Court, we must investigate this relationship further.

Loan participations are "ostensibly simple devices that in fact are highly complex." Patrick J. Ledwidge, Loan Participation Among Commercial Banks, 51 Tenn. L. Rev. 519, 519 (1984). Commentators have cited several problems with participation agreements, in that they create an unbalanced power relationship in which the loan participant is at the mercy of the lead lender. See W. H. Knight, Jr., Loan Participation Agreements: Catching Up With Contract Law, 1987 Colum. Bus. L. Rev. 587, 629-30; Ledwidge, supra, at 526-27 (noting that there is no fiduciary relationship between lead lender and participant). "[T]he hidden dangers in participation agreements . . . usually come to light after lead lender failure." Lori Laughlin Dalton, Comment, Lead Lender Failure and the Pitfalls for the Unwitting Participant, 42 Sw. L.J. 1071, 1071-72 (1989). Based on a belief that financial institutions have the resources to adequately protect their own interests, courts have typically dismissed bank requests for judicial protection in participated loan transactions. Knight, supra, at 587-88.

We have taken part in the trend against granting protection to participating banks. In <u>Union National Bank of Little Rock v. Farmers Bank</u>, we held that a loan participation is not a security under the Securities Exchange Act of 1934. 786 F.2d 881, 884-85 (8th Cir. 1986). Even though the lead bank sold a 100% interest in the loan to the participating bank, under Arkansas law we decided that the lead bank had "no affirmative duty to disclose material information about the participation." <u>Id.</u> at 887. We characterized the participation as "an arms-length transaction." <u>Union Nat'l Bank</u>, 786 F.2d at 887. Our decision was an illustration of the principle that "participants are held to marketplace standards of vigilance and independent inspections. Therefore, banks should conduct independent and prudent evaluations of loans offered for participation." <u>Bank of Chicago v. Park Nat'l Bank</u>, 640 N.E.2d 1288, 1297 (Ill. App. Ct. 1994) (citations omitted).

A leading case on the nature of loan participation agreements is <u>First Bank of WaKeeney v. Peoples State Bank</u>, 758 P.2d 236 (Kan. Ct. App. 1988). The court there held that "[t]he rights of the participant bank flow not from the participation relationship itself but from the express terms of the specific agreement." <u>Id.</u> at 238. The agreement does not give rise to a fiduciary relationship, but rather is an "arms-length contract." <u>See id.</u> at 240 (quoting <u>In re Colocotronis Tanker Sec. Litig.</u>, 449 F. Supp. 828, 833 (S.D.N.Y. 1978)); <u>see also</u> <u>Hibernia Nat'l Bank v. FDIC</u>, 733 F.2d 1403, 1408 (10th Cir. 1984); <u>N. Trust Co. v. FDIC</u>, 619 F. Supp. 1340, 1344-45 (W.D. Okla. 1985). The Minnesota Court of Appeals cited the <u>First Bank</u> decision with approval when addressing the construction of a participation agreement. <u>See</u> <u>Olson v. Citizens State Bank of Montgomery</u>, No. C6-93-455, 1993 Minn. App. LEXIS 949, *4, *7 n.1 (Minn. Ct. App. Sept. 21, 1993) (unpublished). An unpublished decision of the Minnesota Court of Appeals, however, is not precedential. Minn. Stat. Ann. § 480A.08, subd. 3(c) (West 2002).

Although the Minnesota Supreme Court has not directly addressed the nature of a participating bank's rights under a participation agreement, in <u>McIntosh II</u> it

described the participation as an "arm's length" dealing and emphasized the participants' duty to rely on their own independent evaluation of the loans. Id. at 548. The Court's emphasis on the terms of the Participation Agreement convinces us that its view of these transactions is consistent with the commonly accepted understanding. As such, we predict that Minnesota law would hold Bremer to the marketplace standards of vigilance and independent inspection, and not grant it any protection beyond the express terms of the Participation Agreement.

## VIII.

Turning to the district court's decision in the Bremer action, we review its factual findings for clear error and its conclusions of law de novo. Universal Title Ins. Co. v. United States, 942 F.2d 1311, 1314 (8th Cir. 1991); see Part II, supra. As discussed in Part II, above, we may set aside factual findings that are derived from erroneous legal assumptions. See id. The district court found that Bremer had standing to sue Dorsey for malpractice based on a direct attorney-client relationship formed in June of 2000 when Dorsey began work on the President litigation. Bremer argues that it had standing to sue for malpractice that occurred when the loan was closed; Dorsey argues that Bremer never had standing.

McIntosh II controls the question of Bremer's standing to sue for malpractice committed during the closing of the loan. When Bremer bought a participation interest in the St. Regis II loan, it did so "in reliance not on M&S but on [its] own

-28-

independent evaluation of the loan[].” McIntosh II, 745 N.W.2d at 548.  It did not advance the funds to purchase the loan until more than a month after it closed; it did not execute the Participation Agreement until more than two months later.  Bremer has not shown how the record before us is different than the record that led the Minnesota Supreme Court to hold that no reasonable person could conclude that there was a third-party beneficiary relationship.  Id. at 548-49.

We now turn to whether Bremer had standing to sue Dorsey for legal malpractice or breach of contract as of June 2000 when Dorsey began work on the President litigation.  The district court found that Dorsey represented the participants’ interests in the President litigation, not the interests of M&S, which had drafted the Participation Agreement to limit its own liability.  It inferred that M&S was Dorsey’s client only in its capacity as agent for the participants, lending further support for its conclusion that M&S retained Dorsey on the participants’ behalf.  We think the

district court erred in discounting the import of the Participation Agreement between M&S and Bremer.

Based on our understanding of the relationships created by the Participation Agreement, we do not believe that Bremer’s relationship with M&S at any time granted it standing to sue Dorsey for legal malpractice or breach of contract.  A participating bank’s only relationship is with the lead bank; the participant cannot look to the borrower for satisfaction of the debt.  In re Autostyle Plastics, Inc., 269 F.3d 726, 736 (6th Cir. 2001); Hibernia Nat’l Bank, 733 F.2d at 1407; FDIC v. Adams, 931 P.2d 1095, 1104 (Ariz. Ct. App. 1996); First Nat’l Bank of Belleville v. Clay-Hensley Comm’n Co. (Belleville), 525 N.E.2d 217, 222 (Ill. App. Ct. 1988);  First Bank, 758 P.2d at 238.  As a matter of law, none of the loan participants had standing to be a party in the President litigation; only M&S could sue President on the promissory note.  It follows that only M&S was Dorsey’s client in the President litigation.

As defined by the Participation Agreement, the relationship between M&S and Bremer was that of "a seller and purchaser of a property interest." This relationship was not so close that Dorsey's representation of M&S could be imputed to Bremer. The Agreement obligated Bremer to pay M&S's attorneys' fees in proportion to its participation in the loan. M&S could only be liable to Bremer for breach of the Participation Agreement if it failed to use good faith or reasonable care in selection of litigation counsel or breached its overall duty to protect Bremer's interests "in accordance with the customary policies and procedures under which it administers loans for its own account." This standard of care is lower than what is ordinarily imposed on fiduciaries and may only expose the lead lender to liability for bad faith or possibly gross neglect. See First Citizens Fed. Sav. & Loan Ass'n v. Worthen Bank & Trust Co., 919 F.2d 510, 514 (9th Cir. 1990); Belleville, 525 N.E.2d at 222. Due to the arm's-length nature of the contractual relationship between M&S and Bremer, M&S could administer the loan with its own interests at heart.

Dorsey's client in the President litigation was M&S. It owed M&S, not the loan participants, the duties of confidentiality, loyalty, and care that attend the attorney-client relationship. Keeping in mind "the potential ethical conflicts" that might result "[i]f an attorney were to owe a duty to a nonclient," McIntosh II, 745 N.W.2d at 545, we believe that Dorsey did not owe Bremer a duty to disclose potential problems with the St. Regis loan closings. Dorsey was bound to protect the interests of its client M&S, to the derogation of the participants if necessary. Bremer's claim for legal malpractice should have been dismissed.

Furthermore, the district court's theory as to causation strikes us as illogical. The court's finding was that Bremer wasted its money funding the President litigation rather than pursuing a malpractice claim against Dorsey. The district court found, however, Bremer had no standing to pursue a malpractice action for the alleged negligence in the closing of the St. Regis II loans. To prove damages in a legal malpractice case, a client must prove that but for the lawyer's conduct, the client

would have obtained a more favorable result. Jerry's Enterprises, Inc. v. Larkin, Hoffman, Daly & Lindgren, Ltd., 711 N.W.2d 811, 819 (Minn. 2006). Supposing it had standing to sue Dorsey for malpractice in June of 2000, Bremer could not collect damages for negligence that allegedly occurred prior to the attorney-client relationship. Consequently, Bremer could not have satisfied the causation element even if it was Dorsey's client in June of 2000.

IX.

Our decision in the Bremer action foreshadows our decision in the Trustee action. In bankruptcy matters we are a second court of review; we apply the same standards as the district court, reviewing the bankruptcy court's factual findings for clear error and its legal conclusions de novo. In re M & S Grading, Inc., 526 F.3d at 367. Once again, we may overturn any factual findings that are the result of the application of an erroneous legal standard. Shull, 561 F.2d at 155; see Part II, supra.

The bankruptcy court found that Dorsey breached its fiduciary duty of loyalty by representing M&S in Bremer's state-court lawsuit when Bremer was a current client. It also found that Dorsey breached its fiduciary duties of loyalty and full disclosure by failing to disclose that it may have committed malpractice by closing the St. Regis II loan without NIGC approval. In the bankruptcy court's opinion, Dorsey's representation of M&S in the President litigation and in Bremer's state-court lawsuit was materially limited by Dorsey's own interest in avoiding liability for malpractice in closing the St. Regis loans. It further found that the conflicts of interest were blatant, in bad faith, and with fraudulent or ill intent.

We have already determined that Bremer was at no time Dorsey's client or a third-party beneficiary of Dorsey's services. Hence there were no conflicting

-31-

loyalties. The bankruptcy court erred as a matter of law in finding that Dorsey breached its fiduciary duty to M&S by representing it in Bremer's state-court lawsuit. We therefore reverse that aspect of its decision and turn to whether Dorsey breached its fiduciary duty by failing to inform M&S that it may have committed malpractice in the St. Regis closings.

Relying in part on the testimony of the Trustee's expert, Professor Neil Hamilton, the bankruptcy court found that Dorsey's duty to disclose a potential malpractice claim arose from its ethical and professional obligations. First, it discussed the duty to avoid conflicts of interest. See Minn. R. Prof. Conduct 1.7(b). Second, it discussed the duty to keep the client sufficiently informed to permit the client to make informed decisions. See Minn. R. Prof. Conduct 1.4. The court then observed that the Rules of Professional Conduct "do not require a client to prove that a conflict actually affects the eventual representation; but in this case, it surely did."

We believe the bankruptcy court erred by relying too heavily on the Minnesota Rules of Professional Conduct. Demonstrating that an ethics rule has been violated, by itself, does not give rise to a cause of action against the lawyer and does not give rise to a presumption that a legal duty has been breached. Minn. R. Prof. Conduct, Scope; Carlson v. Fredrickson & Byron, P.A., 475 N.W.2d 882, 889 (Minn. Ct. App. 1991), overruled on other grounds by Rouse v. Dunkley& Bennett, P.A., 520 N.W.2d 406, 410 (Minn. 1994). The Rules may, however, "be evidence of breach of the applicable standard of conduct." Minn. R. Prof. Conduct, Scope. "There is a distinction between a disclosure of an ethical concern and the existence of a cause of action." 3 Ronald E. Mallen & Jeffrey M. Smith, Legal Malpractice § 24:5 at 543 (2008 ed.).

Unlike in the ethics context, there is "relatively little case law directly on point—and none in Minnesota" that addresses the lawyer's common-law duty to

confess a potential malpractice claim to his client. See Charles E. Lundberg,[8] Self-Reporting Malpractice or Ethics Problems, 60 Bench & B. Minn. 24, 24 (Sept. 2003). A lawyer's common-law duty to disclose a possible malpractice claim that his client may have against him is a "corollary of the fiduciary obligations of undivided loyalty and confidentiality" the lawyer owes to his client. 2 Ronald E. Mallen & Jeffrey M. Smith, Legal Malpractice § 15:22 at 783 (2008 ed.). Just as the bankruptcy court discussed in the context of a lawyer's ethical standards, there are two aspects of this legal duty. First, the client is entitled to know of any fact that may limit the lawyer's ability to comply with the fiduciary obligations. Id. Second, the client is entitled to be informed of any acts or events over which it has control. Id. By definition, only the first aspect of this duty implicates the lawyer's fiduciary obligations to his client; the second arises from the lawyer's professional standards.

A classic example of a duty to advise a client of potential malpractice is a lawyer who fails to file a lawsuit for a client within the limitations period. See Restatement (Third) of The Law Governing Lawyers § 20, cmt. c (2000). The Restatement classifies this duty as part of the duty to keep the client reasonably informed, but mentions "the resulting conflict of interest that *may require* the lawyer to withdraw." Id. (emphasis added). Withdrawal is only called for if there is a conflict of interest such that "there is a substantial risk that the lawyer's representation of the client would be materially and adversely affected by the lawyer's" own interests. Id. §§ 121, 125. "Disclosure should be made if the failure to do so could reasonably be expected to prejudice the client's continued representation." 3 Mallen & Smith, supra, § 24:5 at 545.

We predict that the Minnesota Supreme Court would not hold a lawyer liable for failure to disclose a possible malpractice claim unless the potential claim creates

---

[8] Mr. Lundberg was Dorsey's expert witness in this case. The bankruptcy court agreed that there were no Minnesota decisions directly on point.

a conflict of interest that would disqualify the lawyer from representing the client. See Carlson, 475 N.W.2d at 889-90 (proposing a similar standard for a lawyer's failure to disclose a conflict related to representation of another client). "When the lawyer's interest in nondisclosure conflicts with the client's interest in the representation, then a fiduciary duty of disclosure is implicated." 3 Mallen & Smith, supra, § 24:5 at 543 ("[T]here is no civil cause of action for a lawyer's failure to confess legal malpractice, which consists simply of nondisclosure of prior negligent conduct, unless there was an independent tort or risk of additional injury."). Thus, the lawyer must know that there is a non-frivolous malpractice claim against him such that "there is a substantial risk that the lawyer's representation of the client would be materially and adversely affected by" his own interest in avoiding malpractice liability. See Restatement (Third) of the Law Governing Lawyers §§ 121, 125.

Negligent legal advice does not give rise to a claim for legal malpractice until the client suffers damages as a result. See Wartnick v. Moss & Barnett, 490 N.W.2d 108, 116 (Minn. 1992) ("There may be errors made by attorneys which do not constitute malpractice as a matter of law but are errors in judgment."); Vesely, Otto, Miller & Keefe v. Blake, 311 N.W.2d 3, 5 (Minn. 1981). It follows that a lawyer's duty to disclose his own errors must somehow be connected to a possibility that the client might be harmed by the error. For a fiduciary duty to be implicated, the lawyer's own interests in avoiding liability must conflict with those of the client. A lawyer may act in the client's interests to prevent the error from harming the client without breaching a fiduciary duty.

We do not believe that Dorsey's representation of M&S in the President litigation was a breach of fiduciary duty. According to the bankruptcy court, Dorsey breached the standard of care by closing the St. Regis loans without first obtaining NIGC approval. The court found that if M&S had known of the risks that the loans could be voided, it would not have closed the loans. But M&S could only be damaged if President defaulted on the loans and the documents proved to be unenforceable.

Dorsey's work on the President litigation was part of its legitimate efforts to prevent its possible error in judgment from harming M&S; there was not a substantial risk that Dorsey's interests were adverse to those of M&S.

Neither do we believe that Dorsey's representation of M&S in Bremer's state-court action was a breach of fiduciary duty. In that action, Bremer accused M&S of fraud, negligent misrepresentation, and breach of contract based on allegations that M&S misrepresented the enforceability of the Pledge Agreement. Reasonable or justifiable reliance is an element of both fraud and negligent misrepresentation. See Martens v. Minn. Mining & Mfg. Co., 616 N.W.2d 732, 747 (Minn. 2000) (fraud); McIntosh I, 726 N.W.2d at 120 (negligent misrepresentation); Flynn v. Am. Home Prods. Corp., 627 N.W.2d 342, 350-51 (Minn. Ct. App. 2001) (negligent misrepresentation). The still-binding portion of the Minnesota Court of Appeals's decision in McIntosh I, however, demonstrates that the language of the Participation Agreement effectively negates the justifiability of Bremer's reliance on M&S's or Dorsey's representations:

Because the participation agreement specifically required [the participants] to affirm that they had made "an independent and informed judgment with respect to the Collateral, Borrower and Obligor and their credit and the desirability of purchasing an undivided interest in the Loan" and to acknowledge that [M&S] made no warranty or representation regarding the enforceability of any loan documents, [the participants'] reliance on Dorsey's advice, as communicated through [M&S], was not justifiable.

726 N.W.2d at 120. Once again, due to the arm's-length nature of the participation relationship between M&S and Bremer, there was not a substantial risk that Dorsey's representation of M&S in Bremer's state-court action was materially and adversely limited by Dorsey's own interests.

There were advantages and disadvantages to Dorsey representing M&S through both the closing of the St. Regis transactions and the litigation that arose from those

transactions. On one hand, Dorsey was intimately aware of all the facts related to the litigation, and the law that controlled the enforceability of the loan documents. On the other hand, there was the potential that Dorsey's lawyers could be called as fact witnesses, and the hazard that "[i]t is far too easy to make the legal advisor a scapegoat for a variety of business misjudgments . . . ." See Viner v. Sweet, 70 P.3d 1046, 1052 (Cal. 2003). Despite the troubles that accompanied the St. Regis loans, the Participation Agreement assigned the risk of those troubles to Bremer, not M&S or its lawyer. Our independent review of the record in light of the controlling McIntosh decisions leads us to conclude that Dorsey is not liable under Minnesota law.

X.

In summary, we reverse the decisions of the bankruptcy court in the Trustee's case and the district court in Bremer's case. The decision of the Minnesota Supreme Court persuades us that it would hold loan participants such as Bremer to the marketplace standards of vigilance and independent inspection, such that its relationship with the lead lender is limited to the express terms of the participation agreement. Due to the arm's-length nature of that relationship, Bremer's relationship with the lead lender M&S did not grant it standing to sue M&S's lawyer Dorsey for legal malpractice or breach of contract. Furthermore, even if Bremer had standing to sue Dorsey, it could not collect damages for negligence that allegedly occurred before it obtained standing.

Because Bremer was not Dorsey's client, Dorsey did not breach its fiduciary duty to M&S by representing it in Bremer's state-court lawsuit. We also predict that the Minnesota Supreme Court would not hold a lawyer liable for failure to disclose a possible malpractice claim unless the potential claim creates a conflict of interest that would disqualify the lawyer from representing the client. The lawyer may act in the client's interests to prevent an error in judgment from harming the client without

breaching a fiduciary duty. We conclude, based on the language of the participation agreement, that there was not a substantial risk that Dorsey's representation of M&S in Bremer's state-court action was materially and adversely limited by Dorsey's own interests. Hence there was no breach of fiduciary duty.

Our decisions are a result of controlling law from the opinions by the Minnesota Supreme Court and Court of Appeals, the inferences we have drawn from the Minnesota opinions, and our duty to correctly ascertain and apply Minnesota law.

XI.

The judgments against Dorsey & Whitney LLP are reversed. The cross-appeal of Bremer Business Finance Corporation is dismissed as moot. We instruct the district court to enter a judgment in Dorsey's favor in the actions of both Bremer and the Trustee.

COLLOTON, Circuit Judge, dissenting.

The appellant, Dorsey & Whitney, LLP, invokes our jurisdiction under 28 U.S.C. § 1291, which authorizes review of "final decisions" of the district courts, including those arising in bankruptcy. *See Conn. Nat. Bank v. Germain*, 503 U.S. 249, 252-53 (1992). We are obliged to consider jurisdictional issues *sua sponte*, even if they are conceded or unnoticed by the parties. *Thomas v. Basham*, 931 F.2d 521, 523 (8th Cir. 1991). A party may not take an appeal under § 1291 until there has been a decision by the district court that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 467 (1978) (internal quotations omitted). A decision that adjudicates fewer than all of the claims, or the rights and liabilities of fewer than all the parties, is not a final decision from which an appeal may be taken under § 1291. *In re Russell*, 957

-37-

F.2d 534, 535 (8th Cir. 1992); *Bullock v. Baptist Mem. Hosp.*, 817 F.2d 58, 59 (8th Cir. 1987); *see also* Fed. R. Civ. P. 54(b).[9] Having reviewed the complex history of this case, I conclude that the district court has not resolved all the claims in the consolidated adversary complaints, and that the appeal must therefore be dismissed for lack of jurisdiction.

This case began with the filing of two adversary complaints in the bankruptcy court. One complaint was filed by the Trustee, Brian F. Leonard, on behalf of Miller & Schroeder's bankruptcy estate, against Dorsey. It has been labeled the Trustee complaint. The second complaint was filed by Bremer Business Finance Corporation, joined by the Trustee, also against Dorsey. It has been called the Bremer complaint. As the majority explains, the Bremer complaint included a claim by the Trustee "for indemnity and contribution against Dorsey to offset any monies that Bremer might recover in its claims against the estate." *Ante*, at 3; Dorsey App. A-99. This claim has not been adjudicated by the district court.

---

[9]Although we have said that a more flexible standard of finality applies to bankruptcy appeals under 28 U.S.C. § 158(d), *e.g.*, *In re Woods Farmers Coop. Elevator Co.*, 983 F.2d 125, 127 (8th Cir. 1993), the appellant here invokes only 28 U.S.C. § 1291, and we have suggested that finality principles under § 1291 do not vary between the bankruptcy context and other civil appeals. *See In re Flight Transp. Corp. Sec. Litig.*, 874 F.2d 576, 580 (8th Cir. 1989) (citing *In re Haw. Corp.*, 796 F.2d 1139, 1141 (9th Cir. 1986)). Portions of the district court's decision on each of the adversary complaints arose through a report and recommendation from the bankruptcy court under 28 U.S.C. § 157(c)(1), rather than as an appeal pursuant to § 158(a), so § 158(d) cannot supply appellate jurisdiction over the entire case. *See Flight Transp. Corp.*, 874 F.2d at 580. And even where more flexible finality standards are applied under § 158(d), an order that disposes of fewer than all of the claims or parties in an adversary bankruptcy proceeding is not a final decision that may be appealed. *See In re Boca Arena, Inc.*, 184 F.3d 1285, 1286-87 (11th Cir. 1999); Fed. R. Bankr. P. 7054(a).

The bankruptcy court first addressed the Trustee's claim for indemnity and contribution in its decision of August 28, 2006. *In re SRC Holding Corp.*, 352 B.R. 103 (Bankr. D. Minn. 2006). After concluding earlier in its opinion that Bremer could recover directly from Dorsey for legal malpractice based on Dorsey's conduct prior to the closing of the St. Regis II loan, the bankruptcy court declared that the Trustee's claim for indemnity and contribution from Dorsey was moot: "[H]aving decided that Bremer may recover directly from Dorsey, probably resulting in the elimination of Bremer's claim against the estate, the Trustee does not require contribution or indemnity from Dorsey making the Trustee's claim moot." 352 B.R. at 182.

When Dorsey objected to the bankruptcy court's report and recommendation, however, the district court concluded that Bremer did not establish a direct attorney-client relationship with Dorsey until after the closing of the loan, and that Bremer could not recover directly from Dorsey based on pre-closing negligence. The district court's order of April 6, 2007, which resolved the objections to the report and recommendation, did not analyze the Trustee's claim for indemnity and contribution. *See In re SRC Holding Corp.*, 364 B.R. 1 (D. Minn. 2007). In response to Bremer's motion to alter or amend judgment, however, the district court clarified that "the Trustee's claim for indemnification and/or contribution is no longer moot." *In re SRC Holding Corp.*, No. 06-3962, 2007 WL 1464385, at *1 (D. Minn. May 15, 2007). The district court explained:

> Although there is no analysis as to the bankruptcy court's recommendation regarding the Trustee's indemnification and/or contribution claim in the Court's opinion, *the Court did not "adopt" the bankruptcy court's recommendation to dismiss the claim as moot.* The bankruptcy court's conclusions were adopted only "to the extent they [were] not inconsistent" with the Court's Opinion. *Here, the bankruptcy[] court's conclusion to dismiss the claim as moot was inconsistent with the Court's Opinion.* The Court found that Bremer was not entitled to recover its investment loss directly from Dorsey, which is contrary to the very basis for the bankruptcy court's recommendation to

dismiss the Trustee's indemnity/contribution claim as moot. Therefore, because the Court found the way that it did, *it is implied in the April 6, 2007 Order that the indemnity/contribution claim is no longer moot.*

*Id.* at *4 (emphases added).

The district court's order also made clear that the Trustee's claim for indemnity and contribution was not resolved. The court observed that "the record before the Court is not complete as to the Trustee's claims for indemnification and/or contribution," and that "[n]o court has tried the issues of Miller & Schroeder's liability to Bremer and Dorsey's liability for contribution or indemnity to the Trustee." *Id.* at *1. The court acknowledged that "dicta" in its April 6 order noted "some evidence that would have supported finding Dorsey's liability to Miller & Schroeder (or the Trustee)," but explained that "such liability was not before this Court and this Court did not conclusively decide it." *Id.* The court said that it "simply *did not address the claim* [for indemnity and contribution] because the claim was not properly presented to the Court and the Court *could not address the claim* because the record is not complete to determine the claim." *Id.* at *4 (emphases added). The court thus "decline[d] to address the merits of the Trustee's contribution/indemnification claims." *Id.* at *5.

In summary, the bankruptcy court recommended that the claim for indemnification and contribution be dismissed as moot. The district court's order of April 6, 2007, did not adopt the recommendation to dismiss the claim as moot, but did not otherwise address the claim on the merits. The district court's order of May 15, 2007, denied a motion to alter or amend judgment, and thus left the April 6 order intact. As a result, the Trustee's claim for indemnification and contribution was not dismissed; it is still unresolved and pending in the district court.

The majority acknowledges that the district court did not adopt the bankruptcy court's recommendation to dismiss the claim as moot. Given that Federal Bankruptcy

-40-

Rule 9033(d) mirrors 28 U.S.C. § 636(b)(1), *ante*, at 16-17, it is clear that the district court had authority to reject the bankruptcy court's recommendation, whether or not Bremer or the Trustee filed a contingent objection. *See Thomas v. Arn*, 474 U.S. 140, 154 (1986) ("[W]hile [28 U.S.C. § 636(b)] does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the judge, *sua sponte* or at the request of a party, under a *de novo* or any other standard."); *Summers v. Utah*, 927 F.2d 1165, 1167 (10th Cir. 1991) ("In the absence of timely objection, the district court may review a magistrate's report under any standard it deems appropriate."); *Delgado v. Bowen*, 782 F.2d 79, 81-82 (7th Cir. 1986) (per curiam) ("[Section 636(b)(1)] should be read as *permitting* modifications and *de novo* determinations by the district judge at all times but *mandating de novo* determinations when objections are raised."). No amendment or alteration of the district court's April 6 order and judgment was necessary to revive the claim for indemnity and contribution, because it was "implied in the April 6, 2007 Order that the indemnity/contribution claim is no longer moot." 2007 WL 1464385, at *4.

Although the district court rejected the only basis on which the bankruptcy court recommended dismissal of the indemnity/contribution claim, the majority asserts that the district court nonetheless dismissed the claim "without discussion." *Ante*, at 22. The majority theorizes that the district court "accepted the bankruptcy court's recommendation that the indemnity and contribution claim be dismissed, without discussion, because none of the parties objected to the recommendation." *Id*. The flaw in this analysis is that the bankruptcy court's recommendation to dismiss the claim cannot be separated from the court's rationale for recommending dismissal. The bankruptcy court recommended that the claim be dismissed as moot; the district court declined to adopt that recommendation, because it was inconsistent with the district court's opinion. The bankruptcy court did not recommend alternatively that the indemnity/contribution claim be dismissed "without discussion," on the merits, or for any other reason. Once the district court rejected the bankruptcy court's recommendation to dismiss the claim as moot, there was no remaining

-41-

recommendation of dismissal to be adopted. The district court's adoption of those portions of the bankruptcy court's recommendation that were not inconsistent with the district court's opinion did not silently dismiss the indemnity/contribution claim on grounds never recommended by the bankruptcy court or stated by the district court. *Cf. Lorin Corp. v. Goto & Co.*, 700 F.2d 1202, 1206 (8th Cir. 1983) ("It does not follow . . . that the absence of objection relieves the district court of its obligation to act judicially, to decide for itself whether the Magistrate's report is correct.").

In its order of May 15, the district court cited the absence of a "contingent objection" by Bremer or the Trustee, and the doctrine of "waiver," to explain why it refused to address the merits of the unresolved claim for indemnity and contribution for the first time on a motion to alter or amend judgment. But this discussion does not establish that the district court *dismissed* the indemnity/contribution claim on April 6, and the May 15 order never states that the claim was dismissed. The court denied Bremer's motion to alter or amend judgment "to the extent Bremer [was] asking [the] Court *to make findings* as to that claim," 2007 WL 1464385, at *1 (emphasis added), citing the fact that neither Bremer nor the Trustee had raised "a contingent objection" asserting that "the indemnification and/or contribution claims would need to be addressed," that is, on the merits. *Id*. at *3. The district court's refusal to address the merits of the claim in that posture, however, does not constitute a dismissal of a claim that the court declared was no longer moot. The court simply denied a motion to alter or amend judgment, and that denial did not function to dismiss a claim that was not previously dismissed by the court's judgment of April 6, 2007.

The majority also contends that the district court "explained that, even if Bremer and the Trustee had not waived their right to review of the indemnity and contribution claim, the claim was properly dismissed because it was premature." *Ante*, at 22. The district court, however, never stated that the indemnity/contribution claim was "dismissed" because it was premature. The court merely referenced the fact that the record was not complete with respect to the indemnity/contribution claim as

part of its explanation for declining to address the merits of the claim at that time. Whether the court *could have* dismissed the claim as premature (or, more likely, certified the April 6 order for immediate appeal under Federal Rule of Civil Procedure 54(b) despite the outstanding claim) is irrelevant to whether the actual decision before us constitutes a final decision for purposes of 28 U.S.C. § 1291.

When a district court adjudicates fewer than all claims in an action, there is no final decision that may be appealed, subject to the exceptions set forth in 28 U.S.C. § 1292, Rule 54(b), and the collateral order doctrine. *Hope v. Klabal*, 457 F.3d 784, 788 (8th Cir. 2006). None of these exceptions applies in this case. The appeal does not involve a collateral order or one of the interlocutory orders enumerated in § 1292(a), and the district court has not certified the adjudicated claims for appeal pursuant to § 1292(b) or Rule 54(b). Accordingly, at least Dorsey's appeal with respect to the Bremer complaint must be dismissed for lack of jurisdiction.[10]

[10]Even if there were a final decision, I would respectfully disagree with the majority's conclusion – based on excerpts from two footnotes in the district court's 94-page opinion (one of which expressly states that disclaimers in the Participation Agreement "play no part" in the court's decision about Bremer's standing) – that the holding and analysis in *McIntosh County Bank v. Dorsey & Whitney, LLP* (*McIntosh II*), 745 N.W.2d 538 (Minn. 2008), "contrast mightily" with the analysis of the district court on the Bremer complaint. *Ante*, at 25. *McIntosh II* held that Dorsey did not represent various bank participants in connection with the loan closing, citing the facts that "there were no communications between the Bank Participants and Dorsey before closing," that "there was no notice to Dorsey that it was expected to represent the Bank Participants," and that "Dorsey was unable to identify the Bank Participants before closing." 745 N.W.2d at 549. In short, "[t]he simple fact that [the banks] would benefit from Dorsey's services does not impose contractual liability." *Id*. Consistent with *McIntosh II*, the district court held that Dorsey did not represent Bremer prior to the loan closing, because "the fact that Bremer would benefit from Dorsey's work while Dorsey represented Miller & Schroeder does not, by itself, establish that Bremer was Dorsey's client." 364 B.R. at 28.

The district court's finding that there was a direct attorney-client relationship

-43-

Our jurisdiction over Dorsey's appeal with respect to the Trustee complaint depends on whether the two consolidated cases filed in the bankruptcy court became one action for purposes of 28 U.S.C. § 1291 and appellate jurisdiction. On May 11, 2005, the bankruptcy court ordered that the two adversary proceedings involving the Bremer complaint and the Trustee complaint were "consolidated for pretrial and trial purposes only." The circuits vary in their treatment of consolidated cases and appellate jurisdiction. As the D.C. Circuit has summarized: (1) "Some circuits hold that consolidated cases remain separate actions and no Rule 54(b) certification is needed to appeal the dismissal of any one of them;" (2) "Others treat consolidated cases as a single action, or presume that they are, allowing the presumption to be overcome in highly unusual circumstances;" and (3) "Still other circuits apply no hard and fast rule, but focus on the reasons for the consolidation to determine whether the actions are one or separate." *United States ex rel. Hampton v. Columbia/HCA Healthcare Corp.*, 318 F.3d 214, 216 (D.C. Cir. 2003) (internal quotations and citations omitted). If the consolidated cases are treated as one action, then lack of finality with respect to a claim in one of the underlying cases means that there is no appellate jurisdiction over the entire action.

Our circuit falls in the third category of circuits that have no "hard and fast rule" about the treatment of consolidated cases. *Id*. We have said that where cases

between Bremer and Dorsey after June 2000 was based on specific underlying facts, such as a cover letter from Dorsey stating that the firm had been "retained to represent the Loan Participants," a memorandum from a Dorsey attorney addressed to the "loan participants" and stamped "subject to attorney-client privilege," and section 4.8 of the Participation Agreement (not discussed in *McIntosh II*), which authorized Miller & Schroeder to retain counsel to represent Bremer and other loan participants. 364 B.R. at 30-32. The district court did not simply conclude that "Dorsey's representation of M&S could be imputed to Bremer," *ante*, at 30, and *McIntosh II* does not call for reversal of the district court's ruling in favor of Bremer. I express no view on Dorsey's several challenges to this ruling, *see* Appellant's Br. 67-75, which are not addressed by the majority.

are consolidated "for the purposes of convenience only," such as where a district court said that consolidation was to "accommodate the convenience of the parties," continued to refer to future filings "in these two suits," and stated that after one complaint was dismissed that there was "still other *related* litigation pending with this same case number," then the presence of an open question in one of the formerly separate suits did not preclude appeal of a final decision in the other suit. *Tri-State Hotels, Inc. v. FDIC*, 79 F.3d 707, 711-12 (8th Cir. 1996) (internal quotations omitted); *see also Grain Land Coop v. Kar Kim Farms, Inc.*, 199 F.3d 983, 990 n. 4 (8th Cir. 1999) (asserting jurisdiction over final judgment in one of two cases where "it appear[ed] the cases were merged for convenience and efficiency only"). But where two actions are "really consolidated and merged into one," *Mendel v. Prod. Credit Ass'n of the Midlands*, 862 F.2d 180, 182 (8th Cir. 1988), or "formally merged for all purposes," *Tri-State Hotels*, 79 F.3d at 711, then all claims in both of the formerly separate cases must be resolved before there is a final decision for purposes of § 1291.

Under the case-by-case approach used by this and several other circuits, I would consider the two underlying adversary actions as one consolidated action for purposes of determining appellate jurisdiction. Although the bankruptcy court implied that the consolidation was somehow limited when it consolidated the cases for "pretrial and trial purposes *only*," the court offered no explanation of what other purpose might exist. Other circuits following the case-by-case approach have held that when two cases are consolidated for discovery and trial, then all claims in both cases must be resolved before the district court's decision is final and appealable. *See Alinsky v. United States*, 415 F.3d 639, 642-43 (7th Cir. 2005) ("Because the district court consolidated these cases for discovery and trial, we conclude that the sixty-day time period for filing a notice of appeal did not begin to run until a final judgment was entered for all four cases."); *Bergman v. City of Atlantic City*, 860 F.2d 560, 566 (3d Cir. 1988) (where cases were consolidated "for all purposes of discovery and trial," an order concluding one of the consolidated cases "should not be considered final and

appealable"); *Ivanov-McPhee v. Wash. Nat'l Ins. Co.*, 719 F.2d 927, 929-30 (7th Cir. 1983) (dismissing appeal of a district court order that resolved all claims in only one of two consolidated actions, where the district court did not state that cases were consolidated "for all purposes," but the cases were consolidated for both trial and discovery purposes, and the court of appeals could not "discern any purposes of substance for which they retain separate identities"). Unlike *Tri-State Hotels*, where the district court continued to refer to "two suits" after consolidation, the district court here stated, without any suggestion of limitation, that the Bremer case was "consolidated with" the Trustee case, 364 B.R. at 24, and referred to the consolidated matter as "this case" in the singular. *Id.* at 51. Although the district court maintained separate docket sheets for the two complaints, the judgments entered in the cases were identical, with each setting forth the court's orders regarding both the Bremer complaint and the Trustee complaint. *See Ivanov-McPhee*, 719 F.2d at 929 ("Apart from the maintenance of these separate docket entries, however, we can perceive no purpose for which these actions have not been treated as one."). Under these circumstances, the consolidated cases are best viewed as a single action, and the lack of finality with respect to the Bremer complaint precludes appellate jurisdiction over an appeal with respect to the Trustee complaint as well.

Upholding the finality requirement in this case furthers the congressional policy against premature appeals and piecemeal reviews in at least one specific respect. Dorsey's lead argument in its appeal of the district court's decision on the Trustee complaint is that Dorsey did not commit legal malpractice. (Appellant's Br. 31-44). Because the firm did not commit malpractice, Dorsey contends, the firm had no duty to disclose a potential malpractice claim to Miller & Schroeder, so the district court's finding of liability for failure to make such a disclosure must be reversed. As the district court explained in its discussion of the claim for indemnity and contribution, however, that court has not resolved whether Dorsey committed malpractice. The court emphasized that the record was not complete on this question, that Dorsey's liability for negligence was not before the court, and that the court "did not

-46-

conclusively decide it." 2007 WL 1464385, at *1. As the issue whether Dorsey committed malpractice remains to be decided with respect to a claim that is still pending in the district court, it would be premature for this court to decide it now. After a final decision on all claims, this court will have the benefit of the district court's findings and conclusions as to whether Dorsey committed malpractice. If the district court were to conclude that Dorsey did not commit malpractice, moreover, then presumably that court could consider in the first instance the argument advanced by Dorsey in this appeal, and reconsider its previous decision, if appropriate.[11]

---

[11]I am not persuaded that the Trustee appeal could be resolved on the alternative ground that Dorsey had no duty to disclose a potential malpractice claim, even where such non-disclosure violates the Minnesota ethics rules, as long as the potential claim does not "create[] a conflict of interest that would disqualify the lawyer from representing the client." *Ante*, at 33-34. This argument was not raised by Dorsey in the district court or in this court. *See JCB, Inc. v. Union Planters Bank, NA*, 539 F.3d 862, 875 n.8 (8th Cir. 2008) ("To be reviewable, an issue must be presented in the brief with some specificity.") (internal quotation and citation omitted). That Dorsey did not criticize the bankruptcy court for "relying too heavily on the Minnesota Rules of Professional Conduct," *ante*, at 32, is not surprising, given that Dorsey's own expert, Charles Lundberg, testified that "*[t]he common law rule is the same as the ethics rule*," that "the cases from jurisdictions which have addressed the issue have uniformly held that an attorney has a professional duty to promptly notify a current client of a lawyer's failure to act and of a possible claim that the client may have against him," that a lawyer has a duty to advise a current client of a potential malpractice claim that is substantial and unknown to the client, and that a failure to do so would violate the lawyer's "duty to advise the client about all pertinent matters to his matter." (T. Tr., Feb. 21, 2006, at 62, 107-08, 115-16) (emphasis added); *see* Charles E. Lundberg, *Self-Reporting Malpractice or Ethics Problems*, Bench & Bar of Minn., Sept. 2003, at 24; s*ee also Perl v. St. Paul Fire & Marine Ins. Co.*, 345 N.W.2d 209, 212 (Minn. 1984) ("The law treats a client's right to an attorney's loyalty as a kind of 'absolute' right in the sense that if the attorney breaches his or her fiduciary duty to the client, the client is deemed injured even if no actual loss results."). It is reasonable to predict that the Supreme Court of Minnesota would regard a client's right to be reasonably informed about a potential malpractice claim in accordance with Rule 1.4 of the Minnesota Rules of Professional Conduct as

For these reasons, I would dismiss the appeal for lack of jurisdiction.

_____

another "absolute" right of the sort discussed in *Perl*. *See* 1 Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering* § 4.7 (3d ed. 2001) (observing that the "core rules" of professional conduct, including Rule 1.4 regarding communication, "are all based on principles of fiduciary relationship and loyal service").